In re Ryan FERGUSON, Petitioner,

v.

Dave DORMIRE, Superintendent, Jefferson City Correctional Center, Respondent.

No. WD 76058.

Missouri Court of Appeals, Western District.

Nov. 5, 2013.

Samuel Henderson, St. Louis, MO, and Kathleen T. Zellner and Douglas H. Johnson, Downers Grove, IL, for petitioner.

Shaun J. MacKelprang and Stephen D. Hawke, Jefferson City, MO, for respondent.

Before Writ Division: GARY D. WITT, Presiding Judge, JOSEPH M. ELLIS, Judge and Cynthia L. Martin, Judge.

CYNTHIA L. MARTIN, Judge.

Ryan Ferguson ("Ferguson") was convicted in 2005 of felony murder in the second degree and first degree robbery. Ferguson filed a petition for writ of habeas corpus, petitioning this court to vacate his convictions and to grant him a new trial either: (i) because newly discovered evidence clearly and convincingly establishes that he is actually innocent thus undermining confidence in his conviction, or (ii) because he has established a gateway permitting review of procedurally defaulted claims that his due process rights were violated depriving him of a fair trial.

We conclude that Ferguson has established the gateway of cause and prejudice, permitting review of his procedurally defaulted claim that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by withholding material, favorable evidence of an interview with Barbara Trump, the wife of Jerry Trump, one of the State's key witnesses at trial. The undisclosed evidence was favorable because it impeached Jerry Trump's explanation for his ability to identify Ferguson. The undisclosed evidence was material because of the importance of Jerry Trump's eyewitness identification to the State's ability to convict Ferguson, because the evidence would have permitted Ferguson to discover other evidence that could have impacted the admissibility or the credibility of Jerry Trump's testimony, and because of the cumulative effect of the nondisclosure when considered with other information the State did not disclose. The undisclosed evidence renders Ferguson's verdict not worthy of confidence.

Accordingly, Ferguson's request for habeas corpus relief is granted. Ferguson's convictions are vacated. Ferguson is ordered discharged from the State's custody subject to the terms and conditions set forth at the end of this Opinion.

**I**

**Factual and Procedural Background**

*Events Leading to Ferguson's Arrest*

On November 1, 2001, Kent Heitholt ("Mr. Heitholt") was murdered in the early morning hours near his car in the parking lot of the Columbia Daily Tribune ("Tribune") in Columbia, Missouri. Mr. Heitholt was the sports editor for the paper. Mr. Heitholt timed off his computer at 2:08 a.m., and left the Tribune building for the parking lot shortly thereafter.

The murder scene was discovered at approximately 2:20 a.m. by Shawna Ornt ("Ornt") and Jerry Trump ("Trump"), two custodians who were working at the Tribune. Both Ornt and Trump saw two white males standing by the driver's side of Mr. Heitholt's car. One of the men hollered "Someone's hurt out here, man." The two men then walked away down an adjacent alley. Trump then saw an obviously injured Mr. Heitholt lying on the ground next to his car. After reporting the discovery of Mr. Heitholt to other Tribune employees, Trump and Ornt called 911 at 2:26 a.m.

Ornt told police that she saw the man who was standing toward the back of the car "really good." Ornt worked with sketch artists in the months following the murder to develop two composite sketches of this man. Ornt described the man as muscular, not stocky, with blond hair and in his early twenties.

Trump told police he could not provide a detailed description of either of the men he saw other than to say that both were white males in their twenties. The man toward the back of the car was described by Trump as wearing a ball cap pushed back on his head, far enough that Trump could see blonde hair spiked up in front. In a supplemental interview with police, Trump reported that he was not certain if he could identify the two individuals again. Trump reported that he was unable to identify the facial characteristics of either man.

Police discovered physical evidence at the scene including unidentified fingerprints in and on Mr. Heitholt's car, and a hair not belonging to Mr. Heitholt but discovered in his hand. Two sets of bloody footwear impressions were located at the scene. Work related papers involving high school and college basketball programs were found around and under Mr. Heitholt's car. Evidence found inside the car suggested that Mr. Heitholt's car door was open at the time of his murder, then closed. Mr. Heitholt's watch and keys were missing, though his wallet was found inside the car.

Police determined that the last known person to see Mr. Heitholt alive was Michael Boyd ("Boyd"), a sports writer who worked under Mr. Heitholt's supervision. Boyd was interviewed by police at approximately 4:00 a.m. and again at approximately 11:45 p.m. on November 1, 2001. He reported that he left the Tribune building at around 2:10 a.m., that he sat in his car for two to three minutes adjusting his radio, and that he then saw Mr. Heitholt exit the Tribune building to head to his car. Boyd told police that he drove over to Mr. Heitholt's car, that he had a three to five minute conversation with Mr. Heitholt,[1] and that he left the parking lot at 2:20 a.m. Boyd told police that as he drove out of the lot he saw Mr. Heitholt getting into his car.[2] Boyd told police he turned westbound out of the lot into the adjacent alley.[3] Boyd told police he did not see anybody around the parking lot or

1. In one statement to the police, Boyd said that he exited his car to talk to Mr. Heitholt. In another statement to the police, Boyd said that he stayed in his car, and spoke with Mr. Heitholt through his rolled down window.

2. In another statement, Boyd said that he saw Mr. Heitholt's tail lights come on as if he was exiting the parking lot.

3. This is the same alley used by the two men Ornt and Trump saw walking away from the murder scene. Statements to the police by Boyd and others indicated that the alley is commonly used by pedestrians in downtown Columbia as it is near several bars and night clubs.

anything that was suspicious.[4]

Mr. Heitholt's murder went unsolved for two years. Though several leads were followed, and persons of interest were investigated, no arrests were made. The investigative efforts focused on locating the two "persons of interest" Ornt and Trump saw in the parking lot.[5] Boyd was never investigated as a person of interest in Mr. Heitholt's murder, though his statements to police placed him with Mr. Heitholt during the time immediately preceding Ornt and Trump's discovery of the crime scene.

Articles appeared in Columbia newspapers about Mr. Heitholt's unsolved murder in and around October 2003. Charles Erickson ("Erickson") read the articles and began to wonder whether he committed the crime. The night Mr. Heitholt was murdered, Erickson and Ferguson (who were then juniors in high school) had been drinking together at By George, a club located within a few blocks of the Tribune. Erickson became heavily intoxicated, "blacked out," and was unable to remember his actions after leaving the club.

In late December 2003 or early January 2004, Erickson told Ferguson he was having "dream like" memories that he and Ferguson may have murdered Mr. Heitholt. Ferguson told Erickson that they had nothing to do with Mr. Heitholt's murder.

Erickson later told friends Nick Gilpin and Art Figueroa about his "dream like" memories. Nick Gilpin reported the conversation to police. On March 10, 2004, the Columbia Police Department contacted Erickson. After questioning, Erickson confessed to involvement in the robbery and murder of Mr. Heitholt and implicated Ferguson. On the same day, Ferguson was arrested in Kansas City, Missouri. Ferguson denied any involvement in the murder and robbery of Mr. Heitholt. Ferguson told police that he and Erickson left By George in his car, and that he dropped Erickson off at his house before going home.

Ferguson was charged with the class A felony of murder in the first degree (section 565.020)[6] and the class A felony of robbery in the first degree (section 569.020). Erickson pled guilty to first degree robbery, second degree murder, and armed criminal action. In exchange for a lesser sentence, Erickson agreed to testify against Ferguson.

### Ferguson's Trial

Ferguson's case proceeded to a jury trial on October 14, 2005. The physical evidence found at the crime scene could not be tied to Ferguson or Erickson.[7] In fact, no physical evidence connected either Ferguson or Erickson to Mr. Heitholt's murder or robbery, or to the crime scene.

---

4. Boyd later told the State's investigator a few months before Ferguson's October 2005 trial that when he left the Tribune parking lot and turned into the alley, he saw two men walking in the alley several feet away. During the habeas proceedings, Boyd added that he was startled when he saw the two men in the alley, as he had been looking in his rear view mirror when he left the Tribune parking lot, and looked forward just in time to avoid hitting the men. Boyd testified that he would not be surprised if the two men had taken down his license plate number.

5. The common pedestrian use of the alley could also suggest that the two men simply happened upon the crime scene.

6. All statutory references are to RSMo 2000, as supplemented to the date of Ferguson's conviction, unless otherwise noted.

7. DNA from the scene was not a match to either Ferguson or Erickson. The bloody footwear impressions did not match either Ferguson's or Erickson's shoe sizes. The fingerprints at the scene did not belong to Ferguson or Erickson.

*Ferguson v. State*, 325 S.W.3d 400, 419 (Mo.App. W.D.2010).

The State nonetheless theorized that Erickson and Ferguson left By George at some point in the early morning hours of November 1, 2001 with the intention of robbing someone so they could have more money to continue drinking. Cell phone records indicated that Ferguson made a call at 2:08 a.m. near By George that lasted a minute or two. The State theorized that after this call, Erickson and Ferguson retrieved a tire tool from Ferguson's trunk then walked around in search of a victim. The State theorized that Erickson and Ferguson walked three to four minutes before happening upon Mr. Heitholt in the Tribune parking lot. According to the State, Mr. Heitholt was then beaten and strangled by Erickson and Ferguson over a several minute period between 2:12 a.m. and 2:20 a.m.[8] Mr. Heitholt sustained multiple head injuries. The testifying pathologist said that Mr. Heitholt was struck eleven times. The State theorized that these injuries were caused when Erickson struck Mr. Heitholt with the tire tool taken from the trunk of Ferguson's car. Mr. Heitholt's cause of death was determined to be asphyxiation caused by strangulation. A mark on Mr. Heitholt's neck matched his belt buckle, which was found on the ground nearby along with a part of his belt. The State theorized that Ferguson strangled Mr. Heitholt with Mr. Heitholt's belt. Though the purported motive was robbery, Mr. Heitholt's wallet was found inside the car at the scene. According to the State, Erickson and Ferguson nonetheless returned to By George and continued drinking because Ferguson remembered he had money in his glove compartment.

The State's evidence in support of its theory was limited to Erickson's confession and to an eyewitness identification of Erickson and Ferguson provided by Trump. *Id.* at 419. At trial, Erickson's confession was severely challenged by Ferguson, as were the investigative and interrogation tactics employed by the State in securing Erickson's confession. "Ferguson's trial counsel was successful in ... seriously undermin[ing] Erickson's credibility." *Id.* at 417.

Trump testified that notwithstanding what he told police officers immediately after the murder, he came to the sudden realization that he could identify the two men he saw in the parking lot after he received a newspaper from his wife in March or April of 2004 while he was incarcerated.[9] Trump testified that the newspaper was folded in such a way that when he removed it from an envelope, he saw the photographs of Erickson and Ferguson before realizing the article involved Mr. Heitholt's murder. Trump testified that he immediately recognized the photographs as the men he saw in the parking lot on the night of Mr. Heitholt's murder. Following this testimony, Trump made an in-court identification of Ferguson. Trump's eyewitness identification testimony was admitted over Ferguson's trial ob-

8. Boyd's statements to the police immediately after Mr. Heitholt's murder placed him in the parking lot or with Mr. Heitholt during this entire time frame. Boyd has been interviewed several times since Mr. Heitholt's murder, and testified in Ferguson's habeas proceedings. His statement that he was in the Tribune parking lot throughout the very time frame hypothesized by the State as the window within which Mr. Heitholt was murdered has never varied.

9. Ferguson and Erickson were arrested in March of 2004. The record indicates Trump was incarcerated for a parole violation in December 2001 and remained incarcerated until mid-December 2004.

jections and following an unsuccessful motion in limine to exclude the testimony.

Ferguson was convicted of second degree murder (section 565.021.1(2)) and first degree robbery (section 569.020). He was sentenced to consecutive prison terms of thirty years on the murder conviction and ten years on the robbery conviction [10] to be served in the Missouri Department of Corrections. Ferguson's convictions were affirmed on direct appeal. *State v. Ferguson*, 229 S.W.3d 612 (Mo.App. W.D.2007).

**Ferguson's Post–Conviction Proceedings**

Ferguson filed a Rule 29.15 motion alleging that ineffective assistance of counsel and *Brady* violations by the State deprived him of his constitutional rights. The motion court denied the motion. On appeal, Ferguson filed a motion to remand his case to the trial court for consideration of newly discovered evidence as Erickson had recanted his trial testimony and now denied that Ferguson participated in the robbery and murder of Mr. Heitholt.[11] We denied the motion to remand for a new trial. *Ferguson*, 325 S.W.3d at 406–10. We held that:

> Ferguson is not without recourse to have this newly discovered evidence

heard in a Missouri court of law. Habeas corpus relief is available "where petitioner can demonstrate manifest injustice or miscarriage of justice by showing that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *State ex rel. Verweire v. Moore*, 211 S.W.3d 89, 91 (Mo. banc 2006).[12]

*Id.* at 409.

After rejecting the motion to remand, we affirmed the motion court's denial of Ferguson's Rule 29.15 motion. *Id.* at 419. Relevant to these proceedings, the *Brady* violations claimed in Ferguson's Rule 29.15 motion included a claim that the State failed to disclose that Ornt told police that neither Ferguson nor Erickson was the person she saw well on the night of Mr. Heitholt's murder. *Id.* at 413. The motion court found the credible evidence established that although Ornt may have had this belief, she never shared this specific belief with the State.[13] We affirmed the motion court's rejection of Ferguson's Rule 29.15 motion. *Id.* at 413–14.

In February 2011, Ferguson filed a petition for writ of habeas corpus in the Circuit Court of Cole County, the county in

---

10. Reportedly, Mr. Heitholt's watch and keys were missing from the crime scene. Those items have never been recovered, and have never been linked to Erickson or Ferguson.

11. In this recantation, Erickson assumed full responsibility for Mr. Heitholt's robbery and murder, but still maintained that Ferguson was present with him at the time. Erickson testified in the habeas proceedings that neither he nor Ferguson robbed or murdered Mr. Heitholt.

12. As we discuss, *infra*, the "remedy" described in *Ferguson*, 325 S.W.3d at 409 is known as the "gateway of actual innocence" which, if established by a preponderance of the evidence, opens the door to permit habeas review of a procedurally defaulted claim that a constitutional violation deprived the defendant of a fair trial. The gateway of manifest

injustice based on a claim of innocence is to be distinguished from a freestanding claim of actual innocence, where a convicted person claims that newly discovered evidence clearly and convincingly establishes innocence warranting a new trial, even though the convicted person received a fair trial free of constitutional defect. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 546–48 (Mo. banc 2003).

13. As we discuss, *infra*, the State acknowledges that Ornt did tell them that she could not identify either Ferguson or Erickson as the one man she saw well in the parking lot-a more equivocal statement than Ornt's Rule 29.15 testimony that neither Ferguson nor Erickson was the man she saw well in the parking lot.

which he was incarcerated. The petition asserted four claims—a freestanding claim of actual innocence, two claims asserting due process violations affecting the fairness of his trial, and a claim asserting the unlawfulness of jury selection procedures used for his trial.

On July 22, 2011, the Honorable Daniel Green denied the habeas claim relating to the manner in which jurors had been selected (Claim Four in the habeas petition). He ordered a hearing on the three remaining claims in Ferguson's habeas petition:

Claim One: a freestanding claim of actual innocence urging that: (a) because Trump had recanted his trial identification of Ferguson and Erickson and his trial testimony that his identification had been triggered by a newspaper sent to him by his wife while he was in prison,[14] (b) because Erickson had recanted his trial testimony, and (c) because a third person, Boyd, probably murdered Mr. Heitholt,[15] Ferguson had clearly and convincingly established his actual innocence as to undermine confidence in the correctness of the judgment of conviction entitling him to a new trial even if he received a fair trial free from constitutional defect;

Claim Two: constitutional violations in the manner in which his trial was conducted, depriving him of due process and entitling him to a new trial because the prosecutor knowingly used Erickson's and Trump's perjured testimony; and

Claim Three: constitutional violations in the manner in which his trial was conducted, depriving him of due process and entitling him to a new trial because the State committed *Brady* violations by failing to disclose interviews with: (a) Barbara Trump (Trump's wife), (b) Michael Boyd, and (c) Kim Bennett.

Following an evidentiary hearing, the Honorable Daniel Green denied the remaining claims in Ferguson's petition for writ of habeas corpus on October 31, 2012 on the merits, and issued his judgment accordingly.

Ferguson then filed a petition for writ of habeas corpus in this court on January 30, 2013 ("Petition"), asserting the same four claims that had been asserted in the habeas petition filed in Cole County. The record submitted by Ferguson with the Petition includes the transcript and certain

14. Between the time Ferguson filed the motion to remand for a new trial in this court based on the newly discovered evidence of Erickson's recantation, and the time he filed his February 2011 habeas petition in Cole County, Trump also recanted his trial testimony. Trump testified in the habeas proceedings that he lied when he testified at Ferguson's trial that he received a newspaper from his wife or anyone else while he was in prison and from which he recognized Erickson's and Ferguson's photographs, and that he lied when he testified at Ferguson's trial that Erickson and Ferguson were the two men he saw in the parking lot on the night of Mr. Heitholt's murder. Trump testified during the habeas proceedings that it was the State that first showed him a newspaper with Ferguson's and Erickson's pictures on the front to determine if he could identify them as the

two men he saw in the parking lot on the night of Mr. Heitholt's murder. Trump testified that he then told the State he could identify Ferguson and Erickson even though he could not. The State denies Trump's account. We have not been required to resolve this contested evidence to determine that Ferguson is entitled to habeas relief.

15. Ferguson later abandoned a portion of Claim One, his freestanding actual innocence claim, relating to the culpability of Boyd. During oral argument, Ferguson's habeas counsel explained that Ferguson strategically dropped the portion of the actual innocence claim pointing to Boyd as a suspect while the habeas proceedings were pending in Cole County in the hope that Boyd would not refuse to testify in connection with those proceedings.

exhibits from Ferguson's 2005 trial; the transcripts, judgments, and opinions from Ferguson's various post-conviction proceedings; and the transcript, exhibits, relevant orders, and judgment from the Cole County habeas proceedings before Judge Green.

We invited suggestions in opposition to the Petition from the State, which were submitted along with additional exhibits on March 5, 2013. We permitted the filing of a reply by Ferguson and *amicus curiae* suggestions from The Midwest Innocence Project. On April 30, 2013, we issued an Order to Show Cause why a writ of habeas corpus should not issue pursuant to Rule 91.05. All briefing requested by the Order was thereafter filed, and the case was orally argued and submitted on September 10, 2013.

## II

### Scope of our Consideration of the Habeas Petition

■ The parties dispute the consideration we should afford Ferguson's Petition. Ferguson contends that pursuant to Rule 91, we are to independently consider the Petition as an original writ, notwithstanding Judge Green's judgment denying an identical habeas petition on its merits. The State argues that because Ferguson's habeas claims were determined by Judge Green on the merits following an evidentiary hearing, we are only permitted to afford writ of certiorari review to Judge

Green's judgment. We agree with Ferguson and disagree with the State.

■ It is true that when a *circuit* court *grants* a petition for writ of habeas corpus, the State has no right of appeal, and that its only recourse is to seek review by filing a petition for writ of certiorari.[16] *State ex rel. White v. Davis*, 174 S.W.3d 543, 547 (Mo.App. W.D.2005) ("Given that there is no appeal from [the grant of a petition for writ of habeas corpus], the State may obtain review by filing a petition for writ of certiorari in the appropriate appellate court.") (citing *State ex rel. Beaird v. Del Muro*, 98 S.W.3d 902, 906 (Mo.App. W.D.2003)). In such cases, we grant the State's petition for writ of certiorari as a matter of right and review the grant of habeas relief, *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001), to determine "whether the habeas court exceeded its authority to grant habeas relief or abused its discretion in issuing the writ of habeas corpus." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 231 (Mo.App. W.D.2011) (citing *State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo.App. W.D.2010)).

Though a petition for writ of certiorari represents the State's sole recourse from the *grant* of habeas relief by a circuit court, no Missouri court has ever held that a habeas petitioner's recourse from the *denial* of habeas relief by a circuit court is by writ of certiorari review. Rather, the Missouri Supreme Court has held that a habeas petitioner has no right to seek ap-

---

**16.** In contrast, pursuant to Rule 84.24(n) which applies to original writ proceedings in the *appellate* courts (and not in the *circuit* courts), if a petition for writ of habeas corpus is granted or denied by the issuance of an *appellate* opinion, writ of certiorari review is not available to either party, and any "further review of the action shall be allowed only as provided in Rule 83 and Rule 84.17." Rule 83 addresses the transfer of a case from the

court of appeals to the Supreme Court. Rule 84.17 addresses post-disposition motions for rehearing, to modify or to publish an opinion filed in the court of appeals. Thus, the State's right to file a petition for writ of certiorari review exists *only* where a *circuit court* grants habeas relief, or in the improbable scenario where an *appellate court* grants habeas relief without an opinion.

pellate review of the denial of a habeas petition, and instead that "[n]othing foreclose[s] the . . . [petitioner] from filing [the same] petition of habeas corpus in a higher court in accordance with Rules 91.02, 84.22, and 84.24." [17] *Bromwell v. Nixon,* 361 S.W.3d 393, 397 (Mo. banc 2012); *see also Blackmon v. Missouri Bd. of Probation and Parole,* 97 S.W.3d 458, 458 (Mo. banc 2003); *Garner v. Roper,* 224 S.W.3d 623, 623, n. 1 (Mo.App. E.D.2007) ("A petitioner's remedy where a petition for writ of habeas corpus is denied is to file a new writ petition in a higher court.").

█ Rule 91.02(a) provides that when a person held in custody seeks to petition for a writ of habeas corpus, "the petition *in the first instance* shall be to a circuit or associate circuit judge for the county in which the person is held in custody . . . unless good cause is shown for filing the petition in a higher court." (Emphasis added.) The Rule thus envisions successive filings, and directs only the first place to file, not the only place to file, a petition for writ of habeas corpus. Consistent with this construction, Rule 84.22(a) states that "[n]o original remedial writ shall be issued by an appellate court in any case wherein adequate relief *can be afforded* by an appeal or *by application for such writ to a lower court.*" (Emphasis added.) In oth-

er words, a habeas petition must be filed *in the first instance* in the lowest court with the authority to grant the relief requested. Rules 91.02(a) and 84.22 are thus consistent with the Missouri Constitution which affords circuit courts, appellate courts, and the Supreme Court nonexclusive and coextensive jurisdiction to entertain original writs. [18] Mo. Const. art. V, sections 4.1, 14(a).

The State acknowledges *Blackmon* and *Bromwell,* but urges that their holdings should be limited to scenarios where a petition for writ of habeas corpus has been summarily denied by a *circuit court* without consideration of the merits of the petition. We decline the State's invitation, and note it is supported by no authority. The plain language of Rule 91.02 and Rule 84.22 does not permit such an interpretation. In stark contrast, Rule 84.24(n) does limit review of a writ petition, but only if the petition has been granted or denied on the merits by the written opinion of an *appellate court.* [19]

█ We conclude that we are required to independently consider Ferguson's Petition as an original writ filed pursuant to the authority of Rule 91 and Rule 84.22, and subject to the procedure set forth in Rule 84.24. [20] We are not, there-

17. Rule 84.24 details the procedure to be followed in *appellate* courts when an original writ is filed.

18. The only limitation on this coextensive jurisdiction is found in Mo. Const. art. V., section 3, and in related Rule 91.02(b), which require habeas petitions in cases involving a capital crime and a sentence of death to be filed in the Missouri Supreme Court.

19. Rule 84.24(n) provides that "[i]f the [appellate] court [denies or grants] a petition for a writ by the issuance of an opinion, further review of the action shall be allowed only as provided in Rule 83 and Rule 84.17."

20. The State argues that we should adopt by judicial construct the framework for review of successive habeas petitions in place at the federal level, and codified at 28 U.S.C. section 2244(b) and Federal Rules of Civil Procedure Rule 9(b). This federal statute and rule operate to bar successive habeas petitions that fail to allege new or different grounds if a prior determination of the claims was made on the merits. The State's argument merely reinforces our conclusion that in the absence of statutory or constitutional constraint, a state habeas petitioner in Missouri is not prohibited from filing successive habeas corpus petitions in this court or in the Supreme Court asserting grounds previously denied by a circuit court, whether or not on the merits. *But see*

fore, conducting appellate review of the judgment entered in Cole County. Any perceived inefficiency associated with affording Ferguson's Petition independent consideration is warranted by the fact that a habeas petition presents the "last judicial inquiry into the validity of a criminal conviction," and is " 'a bulwark against convictions that violate fundamental fairness.' " *State ex rel. Amrine v. Roper,* 102 S.W.3d 541, 545 (Mo. banc 2003) (quoting *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). Our conclusion follows a well-worn procedural path for successive habeas corpus petitions. *See, e.g., State ex rel. Woodworth v. Denney,* 396 S.W.3d 330, 336 (Mo. banc 2013) (entertaining successive habeas corpus petition alleging *Brady* violations following denial by circuit court and court of appeals); *State ex rel. Engel v. Dormire,* 304 S.W.3d 120, 124–25 (Mo. banc 2010) (entertaining successive habeas corpus petition alleging *Brady* violations following denial by circuit court and court of appeals); *Brown v. State,* 66 S.W.3d 721, 732 (Mo. banc 2002) *disagreed with on unrelated grounds by State ex rel. Zinna v. Steele,* 301 S.W.3d 510, 517 (Mo. banc 2010) (holding that "denial of a petition for writ of habeas corpus is not appealable," and that instead "the remedy is to file a new petition in a higher court"); *State ex rel. Nixon v. Jaynes,* 63 S.W.3d 210, 217 (Mo. banc 2001) *disagreed with on unrelated grounds by Zinna,* 301 S.W.3d at 517 (holding that "[s]uccessive habeas corpus petitions are ... not barred"); *E.W. v. K.D.M.,* 490 S.W.2d 64, 66–67 (Mo. banc 1973) (holding that appeal would not lie from denial of habeas corpus relief by circuit court **following an evidentiary hearing,** and that "under existing procedures, promptness of adjudication can be best accomplished by

Rule 91.22 which provides that "[w]hen a petition for writ of habeas corpus has been denied by a higher court, a lower court shall

the filing of a new petition for writ of habeas corpus" in the court of appeals).

We thus turn our attention to an independent consideration of Ferguson's habeas Petition as an original writ.

## III

### Claims We are Permitted to Consider on Habeas Review

■■ " '[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government.' " *Engel,* 304 S.W.3d at 125 (quoting *Amrine,* 102 S.W.3d at 545). "Habeas proceedings are limited to determining the facial validity of a petitioner's confinement." *State ex rel. Griffin v. Denney,* 347 S.W.3d 73, 77 (Mo. banc 2011). Habeas proceedings are not intended to " 'correct procedural defaults as to post-conviction remedies.' " *McElwain,* 340 S.W.3d at 243 (quoting *Jaynes,* 63 S.W.3d at 213). In other words, "habeas corpus is not a substitute for appeal or post-conviction proceedings." *State ex rel. Simmons v. White,* 866 S.W.2d 443, 446 (Mo. banc 1993).

■■ A defendant who fails to raise a challenge to his conviction on direct appeal or in a timely post-conviction proceeding "is said to have procedurally defaulted on those claims." *Jaynes,* 63 S.W.3d at 214. Procedurally defaulted claims *cannot* be raised in a petition for writ of habeas corpus *unless:* (1) the claim relates to a jurisdictional issue; or (2) the petitioner establishes "a showing by the preponderance of the evidence of actual innocence, [that] would meet the manifest injustice standard for habeas relief under Missouri

not issue the writ unless the order in the higher court denying the writ is without prejudice to proceeding in a lower court."

law," (a "gateway of innocence claim"); or (3) the petitioner establishes "cause for failing to raise the claim in a timely manner and prejudice from the constitutional error asserted," (a "gateway cause and prejudice claim"). *Amrine*, 102 S.W.3d at 546. Establishment of either "gateway" does not support habeas relief, but serves to permit habeas review of a constitutional challenge regarding the fairness of the defendant's trial that is otherwise procedurally defaulted. *Id.* (citing *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000)).

■ Ferguson "has the burden of proving he is entitled to habeas corpus relief." *Griffin*, 347 S.W.3d at 77. As we discuss below, we conclude that Ferguson has met his burden by establishing the gateway of cause and prejudice and by establishing that the State committed a *Brady* violation in connection with an undisclosed interview with Barbara Trump. To reach this conclusion, we have thoroughly reviewed and considered the extensive habeas record.[21]

Each of Ferguson's habeas claims seeks the same relief-vacation of Ferguson's convictions and a new trial. That is consistent with the fact that:

> A writ of habeas corpus does not declare or determine guilt or innocence of a defendant. A writ of habeas corpus merely operates to vacate a conviction where principals [sic] of justice and fundamental fairness require, permitting the State to retry the defendant should it so elect.

*McElwain*, 340 S.W.3d at 232 (citing *Schlup v. Delo*, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). Since Ferguson seeks the same relief as to each of his habeas claims, the grant of relief on

any one of Ferguson's habeas claims effectively negates the need to address remaining claims. *Id.* Because we conclude that Ferguson has established a Brady violation in connection with an undisclosed interview of Barbara Trump, we need not address the merit of any of Ferguson's remaining habeas claims, and each is denied without prejudice to refiling.

## IV

### Undisclosed Barbara Trump Interview

■ Ferguson claims that the State committed a *Brady* violation because it did not disclose an interview with Barbara Trump where she reluctantly reported that she had no recollection of sending her husband a newspaper while he was in prison with an account of the arrests for Mr. Heitholt's murder. Ferguson claims that he was prejudiced because the undisclosed interview was impeaching of Trump's explanation of the event which triggered his ability to identify Erickson and Ferguson, and because the undisclosed interview would have led to the discovery of the additional undisclosed fact that the State contacted Trump while he was in prison. This undisclosed government contact was relevant, according to Ferguson, because it impacted the standard applied by the trial court to rule on the admissibility of Trump's identification testimony, and because it would have permitted further impeachment of Trump's identification as suggested or coerced by the State. To prevail on his *Brady* claim, Ferguson "must show each of the following: (1) the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) the evidence was sup-

---

21. We are afforded "substantial flexibility in handling [a] petition for habeas corpus." *E. W.*, 490 S.W.2d at 67. Although Rule 68.03 affords us the discretion to appoint a master to determine referred issues, we have not exercised that discretion here as we did not deem it necessary to do so in order to find that Ferguson is entitled to habeas relief.

pressed by the State, either willfully or inadvertently; and (3) he was prejudiced." *Engel*, 304 S.W.3d at 126.

■ Ferguson's *Brady* claim is procedurally defaulted as it alleges a challenge to his conviction that should have been raised on direct appeal or in a timely Rule 29.15 motion. *Griffin*, 347 S.W.3d at 77. To secure review of his defaulted *Brady* claim, Ferguson must establish the gateway of cause and prejudice, the gateway of innocence/manifest injustice, or a jurisdictional defect. *Id.* (citing *Amrine*, 102 S.W.3d at 546).

■ Ferguson's Petition argues that the gateways of cause and prejudice and manifest injustice/innocence [22] have both been established, permitting review of his defaulted *Brady* claim. We find that the gateway of cause and prejudice is established on this record. As a result, we need not address whether the gateway of manifest injustice/innocence is also established. *Id.* at 77 n. 1. ("Because [habeas petitioner] is entitled to relief under the cause and prejudice standard, there is no need to discuss his claims of manifest injustice.").

■ To establish "cause" for purposes of the gateway of cause and prejudice, Ferguson must establish that an objective factor external to the defense explains the failure to raise his *Brady* claim in a timely manner. *Engel*, 304 S.W.3d at 126; *McEl-*

*wain*, 340 S.W.3d at 246. This prong of the cause and prejudice gateway is partially coextensive with the second element of a *Brady* violation because if Ferguson establishes that the State failed to disclose favorable evidence, he will have established an objective factor external to the defense. *See Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). To fully establish "cause," however, Ferguson must also demonstrate that the nondisclosure explains the procedural default of his *Brady* claim because he did not know or have reason to know about the undisclosed Barbara Trump interview in time to raise the claim on direct appeal or in a post-conviction motion. *Engel*, 304 S.W.3d at 126 ("This Court will not undertake habeas review of [a *Brady*] claim[ ] unless [the petitioner] can 'establish that the grounds relied on ***were not known to him*** during his direct appeal or post-conviction case.' ") (quoting *Simmons*, 866 S.W.2d at 446) (emphasis added).

The analysis of "prejudice" under the cause and prejudice gateway is coextensive with the third element of a *Brady* claim. "[S]o long as [Ferguson] establishes the prejudice necessary to support his *Brady* claim[ ], he will have shown the required prejudice to overcome the procedural bar for habeas relief." *Id.*

■ To determine whether suppressed evidence prejudices a defendant,

---

**22.** Ferguson's argument that the manifest injustice gateway has been established depends on the same "newly discovered evidence" Ferguson relies on to assert Claim One—the freestanding claim of actual innocence. The claims rely on the same evidence but are nonetheless materially different. A freestanding claim of innocence presumes that a defendant received a fair trial free of constitutional defect. As such, the defendant must clearly and convincingly establish that newly discovered evidence demonstrates the likelihood that an innocent man has been convicted in

order to secure a new trial. *Amrine*, 102 S.W.3d at 546–48. The manifest injustice/gateway of innocence claim is not itself a basis for habeas relief, but will afford a defendant the right to review of an otherwise procedurally defaulted claim that constitutional error deprived the defendant of a fair trial. *Id.* at 546. To establish the manifest injustice/gateway of innocence, a defendant need only establish by a preponderance that newly discovered evidence suggests an innocent person has been convicted. *Id.*

we assess whether the evidence is material. *Id.* at 128. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "[The] touchstone of materiality is a 'reasonable probability' of a different result[.]" *Id.* "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Thus, our Supreme Court has held that:

> The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. [ ] *The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial . . . resulting in a verdict worthy of confidence."*

*Engel,* 304 S.W.3d. at 128 (quoting *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555) (emphasis added). In short, materiality is not "a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434–35, 115 S.Ct. 1555. Instead, "[w]e have held that the Brady standard of materiality lies somewhere between the newly-discovered evidence standard, in which a new trial is warranted only if the new evidence would have changed the outcome of the original trial, and the harmless error standard." *Wallar v. State,* 403 S.W.3d 698, 707 (Mo.

App. W.D.2013). We ask whether the "'undisclosed evidence would have been significant to the defendant in the way that he tried his case. . . . [If so], the evidence is material under [the] Brady analysis.'" *Id.* (quoting *Buchli v. State,* 242 S.W.3d 449, 454 (Mo.App. W.D.2007)).

■ In assessing materiality, we take into "'account . . . not only . . . the precise evidence suppressed but also . . . such additional evidence to which a skillful counsel would be led by careful investigation.'" *State v. Thompson,* 610 S.W.2d 629, 633 (Mo.1981) (quoting *Lee v. State,* 573 S.W.2d 131, 134 (Mo.App.1978) *abrogated on unrelated grounds by U.S. v. Ruiz,* 536 U.S. 622, 628–33, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)). Further, we must consider the cumulative effect of undisclosed evidence in assessing materiality. *Engel,* 304 S.W.3d at 126 (citing *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555).

■ If materiality is established, then "'the suppression . . . violates due process . . . irrespective of the good faith or bad faith of the prosecution.'" *Merriweather v. State,* 294 S.W.3d 52, 54 (Mo. banc 2009) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. 1194).

We turn to consideration of Ferguson's *Brady* claim involving an undisclosed interview with Barbara Trump. Because the elements of a *Brady* claim are largely coextensive with "cause" and "prejudice," we analyze Ferguson's claim employing the cause and prejudice rubric.

### (i) Cause

■ As noted, "cause" is partially established with proof that the State failed to disclose favorable evidence, as that act by its essence constitutes an objective factor external to the defense. The State admits that the Barbara Trump interview was not disclosed, and that the interview was fa-

vorable because it was potentially impeaching.

William Haws [23] ("Haws") testified as a witness for the State in the habeas proceedings. Haws identified himself as a former investigator for the Boone County prosecutor, Kevin Crane ("Crane").[24] Haws testified that he was involved in the "investigation and preparation of the case of *State v. Ryan Ferguson.*" He testified that his trial preparation responsibilities included interviewing witnesses.

During the habeas proceedings, Haws was asked by the State about the procedure he used when interviewing witnesses:

Q: And is it your practice when you interview witnesses to make reports of what they tell you?

A: Yes.

Q: And the purpose to make reports is what?

A: *Well, to make sure that information is preserved and passed on in discovery.*

(Emphasis added.) Despite this reported practice and its purpose, Haws failed to prepare written reports following several witness interviews conducted in connection with Ferguson's case. One example was his interview of Barbara Trump.

In the habeas proceedings, Haws testified that he and Crane met with Trump on December 21, 2004, shortly after Trump was released from prison. In that meeting, according to Haws:

[Trump] told us his wife had received a—he had received a newspaper article from the Tribune and his wife sent it to him in prison, and that when he saw the pictures of the defendant—defendants in

the newspaper, he recognized them as the people he had seen on the parking lot at the Tribune.

Haws testified that this was "surprising new information." Haws testified that after the meeting with Trump, Crane told him to "try[ ] to find out what that article was." Haws reported he went to the Tribune "pretty quickly" after the meeting with Trump to find the newspaper article.

Haws also testified that he interviewed Barbara Trump, Trump's wife. Haws testified:

Q: Where did [Trump] get the article?

A: He said his wife sent it to him.

Q: When you went and talked to her, what did she say?

A: She said she didn't recall sending it to him.

Q: You never talked to her, did you?

A: I talked to her on the phone. Q: When was that?

A: I don't know. It was sometime after that. And she was very reluctant.

Q: Did you write a report on that?

A: No. I recall talking to her.

Q: But again, you didn't write a report?

A: I did not write a report.

Q: Okay. She was very reluctant, what do you mean by that?

A: My impression was that she didn't—I explained to her that Jerry said that she sent him an article, and she said, I don't remember that and I really don't want to talk to you about this.

---

**23.** From time to time, the record reflects the spelling of William Haws's name as "Hawes."

**24.** Crane has since been elected as a judge and is serving on the Boone County Circuit Court. We refer to him in this opinion by his

last name to avoid any confusion, as pertinent to this case Crane was serving as the elected Boone County prosecutor who tried Ferguson.

Q: She didn't remember ever doing that. Correct?

A: That's right.

When asked during oral argument, the State acknowledged that "it is ... not in dispute ... that with respect of any witness interview for whom there was not a report generated there was not a disclosure of that interview." Thus, it is reasonable to conclude that neither the fact nor the content of the Barbara Trump interview was disclosed to Ferguson.[25]

 In fact, the State pointed out that because no report was made, Crane was similarly unaware of Haws's interview of Barbara Trump. Crane was asked during a deposition taken in the habeas proceedings whether he "ever interviewed [Barbara Trump] to confirm whether she had sent the article?" Crane answered: "No, I never met his wife." The State thus noted during oral argument that "[Crane] wouldn't have had a report, and he didn't have contact with her. So he wouldn't have known" about the interview with Barbara Trump. Other than to underscore that without a report, no disclosure of the interview was made to Ferguson, Crane's lack of awareness of the interview is immaterial, however, because:

> [I]t is no hindrance to [a] *Brady* claim that the prosecutor did not have the same knowledge about his case as the investigators. The prosecutor's lack of knowledge about information asserted in a *Brady* claim is not an impediment because the prosecutor is considered "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

---

**25.** During oral argument the State responded "I believe that is correct" when asked if Haws's failure to prepare a written report of the interview with Barbara Trump meant that no disclosure of the interview was made to Ferguson. The State did assert during oral argument that there was a "dispute" in the record about whether Haws interviewed Barbara Trump before trial or in connection with Ferguson's post-conviction proceedings. In a post-argument letter, the State softened its characterization, claiming only that the record on the subject is "ambiguous," because Haws only testified that he talked with Barbara Trump "sometime after" the meeting with Trump in December 2004.

The record is not ambiguous on this point. Haws was asked by the State during the habeas proceedings to identify his role in the Ferguson case. He testified that he was an investigator for the Boone County prosecutor's office, and that he assisted with trial preparation, including witness interviews, in the State's prosecution of Ferguson. There is no indication whatsoever that Haws ever interviewed witnesses in connection with Ferguson's post-conviction proceedings. Further, read in context, Haws's habeas testimony addressing the interview with Barbara Trump was part of a broader discussion about Haws's investigatory efforts in response to the meeting with Trump on December 21, 2004. Haws's testimony that he interviewed Barbara Trump "sometime after that" clearly referred in this context to the time frame between the December 21, 2004 meeting with Trump and Ferguson's trial. In fact, there would have been no need for Haws to tell Barbara Trump during his interview with her what Trump had told Haws and Crane unless the interview preceded Ferguson's trial. Finally, it is noteworthy that the State's extensive briefing before the Cole County Circuit Court and in this Court responding to Ferguson's habeas claim that the State committed a *Brady* violation when it failed to disclose the Barbara Trump interview is strikingly silent on the supposed "ambiguity" raised for the first time during oral argument. Instead, the State's briefing has effectively conceded the first two elements of a *Brady* violation in connection with the Barbara Trump interview, focusing only on whether the undisclosed interview was "material," and thus prejudicial.

*Engel,* 304 S.W.3d at 127 (footnote omitted) (quoting *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

The State's nondisclosure of the Barbara Trump interview is only objectionable under *Brady* if the interview was favorable to Ferguson. Ferguson claims that the Barbara Trump interview was favorable impeaching evidence. "Prosecutors must disclose, even without a request, exculpatory evidence, including evidence that may be used to impeach a key government witness." *Buck v. State,* 70 S.W.3d 440, 445 (Mo.App. E.D.2000); *Evenstad v. Carlson,* 470 F.3d 777, 784 (8th Cir.2006) ("The *Brady* rule applies to evidence which 'impeaches the credibility of a . . . witness' . . . whether or not the accused has specifically requested the information.") (citation omitted).

Barbara Trump's report to Haws that she had no recollection of sending her husband a newspaper while he was in prison contradicts Trump's testimony about how he came to identify Erickson and Ferguson, and was thus impeaching. *Maugh v. Chrysler Corp.,* 818 S.W.2d 658, 661 (Mo.App. W.D.1991) (holding that contradiction can serve as either substantive evidence or as a method of impeachment). Any question that the undisclosed Barbara Trump interview constituted favorable impeaching evidence was resolved at oral argument when the State acknowledged that Barbara Trump's interview was "potentially impeaching." We agree, as the undisclosed Barbara Trump interview was evidence that could have been "used . . . to impeach a key government witness." *Buck,* 70 S.W.3d at 440.[26]

The first and second elements of a *Brady* violation are therefore established by the record. Thus, Ferguson has partially established "cause," as the State's failure to disclose Barbara Trump's interview is an objective factor external to the defense. It remains Ferguson's burden, however, to fully establish "cause" by demonstrating that the State's nondisclosure explains his failure to raise a related *Brady* claim on direct appeal or in his Rule 29.15 motion. *Banks,* 540 U.S. at 691, 124 S.Ct. 1256.

Ferguson contends that he did not know about the Barbara Trump interview at the time of his direct appeal or his Rule 29.15 motion. Ferguson contends he did not learn that Barbara Trump had been interviewed by Haws and would have contradicted her husband's testimony about the source that triggered his identification until sometime after Trump recanted his trial testimony. There is no dispute that Trump's recantation occurred well after the time within which Ferguson was required to file a direct appeal or a Rule 29.15 motion.

The State acknowledges that Ferguson did not know about Barbara Trump's possible testimony or about the State's failure to disclose its interview with Barbara Trump until after Trump recanted his trial testimony. The State thus does not contest that Ferguson did not know about the nondisclosure in time to raise it on appeal or in his post-conviction motion. The State argues, however, that the nondisclosure does not explain Ferguson's failure to timely raise a *Brady* claim as Ferguson *could* have learned about the Barbara Trump interview through a more diligent investigation. In effect, the State seeks to avoid the consequences of its nondisclosure by arguing that it was Ferguson's fault for not sooner discovering the *Brady* violation.

Ferguson "cannot be faulted for failing to raise the nondisclosure of evi-

---

**26.** We appreciate the Assistant Attorney General's candor on this point during oral argument. *See State ex rel. Koster v. Green,* 388 S.W.3d 603, 606 n. 5 (Mo.App. W.D.2012).

dence that he did not know about." *Buck*, 70 S.W.3d at 445. The United States Supreme Court has observed that the nondisclosure of information as to which the defendant was not otherwise aware "ordinarily establish[es] the existence of cause for a procedural default." *Strickler*, 527 U.S. at 283, 119 S.Ct. 1936. "[T]he notion that defendants must scavenge for hints of undisclosed *Brady* material" is without support. *Banks*, 540 U.S. at 695, 124 S.Ct. 1256. Any rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696, 124 S.Ct. 1256.

> To suggest, as the State does, that [Ferguson] should be penalized for the *State's* failure to timely honor its legal disclosure obligations by having [Barbara Trump's interview] entirely disregarded [because it was not earlier discovered] is repugnant to the concept of fundamental fairness. The only reason for the . . . delay was the State's failure to disclose impeachment evidence it had a legal duty to provide to the defense prior to or during trial in the first place. Thus, [Ferguson] cannot be faulted for failing to raise and fully investigate the State's nondisclosure of *Brady* evidence that he did not know about until . . . years had passed.

*State v. Parker*, 198 S.W.3d 178, 193–94 (Mo.App. W.D.2006) (J. Ellis, dissenting) [27] (citation omitted).

The State's argument that "cause" is not established by its nondisclosure of the Barbara Trump interview is also belied by its observation during oral argument that "everybody sort of operated on the assumption that [Trump did receive the newspaper from his wife] . . . both the State and the defense." [28] Consistent with this fact, Ferguson had no reason to suspect that the source of Trump's claimed ability to identify Ferguson and Erickson was fabricated, and could have been impeached by Barbara Trump's testimony at trial, until Trump recanted his trial testimony. This is simply not a case where Ferguson either knew or reasonably should have known that Trump would recant his testimony about receiving a newspaper from his wife, or that Haws had interviewed Barbara Trump and was thus aware that she could impeach Trump.[29]

We conclude that Ferguson has established "cause" external to the defense which explains his failure to raise a *Brady* claim related to the Barbara Trump interview on direct appeal and in his Rule 29.15 motion. *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . would constitute

---

**27.** *Parker* involved an appeal from the denial of a Rule 29.15 motion. 198 S.W.3d at 179. The dissent concurred with the majority's determination that a *Brady* violation occurred, but disagreed with the majority's decision to remand for a materiality determination, believing the record supported a materiality determination without need for remand.

**28.** Recall, the State points out that Crane did not know about Haws's interview with Barbara Trump because Haws made no written report of the interview.

**29.** We thus distinguish this case from the line of cases cited in *State v. Moore*, 411 S.W.3d

848, 855 (Mo.App. E.D.2013) for the proposition that "there can be no *Brady* violation where the defendant knew or should have known of the [undisclosed] material or where the material was available to the defendant from another source." The cases cited in *Moore* address circumstances where "necessary facts for impeachment are readily available to a diligent defender," *U.S. v. Rodriguez*, 162 F.3d 135, 147 (1st Cir.1998), or where undisclosed evidence "was a matter of public record." *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir.2008).

cause....”); *Engel,* 304 S.W.3d at 126 (holding habeas petitioner must establish that the grounds relied on were not known to him during direct appeal or post-conviction proceedings) (citing *Simmons,* 866 S.W.2d at 446).

### (ii) Prejudice

 We next assess whether Ferguson has established the prejudice prong of the gateway of cause and prejudice, which is coextensive with the third element of a *Brady* violation. This analysis requires us to determine whether the undisclosed Barbara Trump interview was material.

We conclude that the undisclosed interview was material. The undisclosed interview impeached an important government witness whose testimony was heavily relied on by the State to secure Ferguson's conviction. The undisclosed interview could have led Ferguson to discover additional evidence that would have aided in his defense. And the undisclosed interview is material when cumulatively considered with other evidence the State failed to disclose to Ferguson.

### a. *The undisclosed interview impeached an important government witness whose testimony was relied on heavily by the State to secure Ferguson's conviction*

Ferguson was convicted based solely on the now recanted confession of Erickson, and on Trump's now recanted eyewitness identification of Erickson and Ferguson. *Ferguson,* 325 S.W.3d at 419. The State admitted during oral argument that Erickson and Trump's testimony "were the two most important pieces of evidence in the case."

Ordinarily, a confession by a co-defendant might relegate the testimony from an eyewitness to merely cumulative of other compelling inculpatory evidence. In such a case, undisclosed evidence impeaching the eyewitness might not be sufficiently material as to render a guilty verdict not worthy of confidence, particularly if other evidence of guilt, including physical evidence, ties a defendant to a crime. *See, e.g., Strickler,* 527 U.S. at 292–94, 119 S.Ct. 1936 (denying writ of habeas corpus where State withheld favorable evidence impeaching an eyewitness because the evidence was not material in light of the testimony of two other witnesses placing defendant at the scene, and because of "considerable forensic and other physical evidence linking" the defendant to the crime).

This was not an ordinary case. No physical evidence tied Erickson or Ferguson to Mr. Heitholt's murder or the crime scene. Physical evidence found at the scene did not match to either Erickson or Ferguson as the source. Besides Trump, no other eyewitness placed Ferguson or Erickson at the scene. Erickson's confession, which originated from "dream like" memories, was seriously challenged by Ferguson at trial. Ferguson emphasized police interrogation tactics which cast doubt on whether Erickson's memories were genuine or suggested by the police. In connection with Ferguson's Rule 29.15 proceedings, the State defended Ferguson's post-conviction claims by emphasizing that Erickson's trial testimony was challenged by a "substantial quantum of impeachment evidence." [30] On appeal, we agreed and observed that:

---

**30.** In Ferguson's Rule 29.15 proceeding, the State's argued in its Brief that Ferguson's defense "presented a substantial quantum of impeachment evidence" with regard to Erickson's testimony, including inconsistent and

incorrect statements to the police; statements indicating he might be confusing memories with dreams; statements that he could not recall certain facts, and was simply presuming or trying to guess some of the facts; indi-

Erickson was subjected to a lengthy and extensive cross-examination, wherein Ferguson's trial counsel was successful in illustrating that Erickson had made various prior statements that seriously undermined Erickson's credibility.

*Ferguson*, 325 S.W.3d at 417.

The State appreciated in advance of Ferguson's trial that Erickson's confession was problematic. During the habeas proceedings, Crane testified that "It was a tough case. I'll admit that." Crane acknowledged that he knew "Erickson ... had some memory problems," and that "being a diligent prosecutor, ... [he] wanted ... if there was another witness out there that could identify [Erickson and Ferguson] [he] certainly wanted to have that witness testify [truthfully]." Crane thus testified in a deposition that he "thought [Jerry Trump] was an important witness." Similarly, Haws testified in the habeas proceeding as follows:

Q: It was very helpful to the case and the prosecution of Ryan Ferguson that Jerry Trump came forward and identified Erickson and Ferguson, is that correct?

A: It appeared to be at that time, yes.

Trump's eyewitness identification in late 2004 was burdened, however, by his statements in 2001 that he could not identify the two men he saw in the parking lot because he did not see their facial features. An explanation for Trump's delayed but sudden ability to identify two men he previously thought he could not identify was thus important to the reliability and believability of the identification.

Trump testified during Ferguson's trial that his identification of Erickson and Ferguson was triggered by the unexpected receipt of a newspaper from his wife in March or April 2004 while he was in prison. Trump testified that the paper was folded "just so" as to reveal the photographs of Erickson and Ferguson as he removed the paper from an envelope, and that he immediately realized (without first seeing a headline) that "I've seen these two faces before," instantaneously recognizing that they were the faces he saw in the parking lot on the night of Mr. Heitholt's murder. Trump's testimony that his identification was unexpectedly and suddenly triggered was, according to Crane's testimony, "compelling." Haws testified in the habeas proceedings that Trump's claimed recognition of Erickson and Ferguson from a newspaper article was "a pretty big deal in a pretty big case." The State acknowledged during oral argument that Trump's story about how he came to identify Erickson and Ferguson was an "important fact at the time."

■ "[A] useful measure of the importance of a given witness ... and the materiality of *Brady* evidence affecting [his] credibility is the amount of emphasis the prosecutor placed on the witness[']s testimony at trial." *Parker*, 198 S.W.3d at 192 n. 8 (J. Ellis, dissenting) (citing *Kyles*, 514 U.S. at 444, 115 S.Ct. 1555). The State repeatedly emphasized Trump's explanation for his identification during Trump's direct examination at Ferguson's trial. On no less than seven occasions, Trump was asked questions on direct examination that reinforced his receipt of the newspaper from Barbara Trump as the trigger for the

cations from taped interrogations that he was asking for facts and details from the police which were provided to him; suggestions that interrogating officers were not sure he was involved in the murder or that he knew what he was talking about; that he reported to

police that he could be fabricating his story, and was "foggy" in his recollections; and that notwithstanding his confession, he had no conscious belief that he was involved in the murder.

identification.[31] The State then introduced the front page of the March 11, 2004 edition of the Tribune into evidence, and had Trump identify it as the newspaper Trump received from his wife, and from which his eyewitness identifications of Erickson and Ferguson were triggered.[32] During closing argument, after spending several minutes attempting to dispel the damage done to the credibility of Erickson's confession, the State argued:

> And Jerry Trump. Jerry Trump, in front of you all, in court, said, *"I saw those photos, and they were the ones."* And in court, he pointed him out.

(Emphasis added.) " 'The likely damage [from a *Brady* nondisclosure] is best understood by taking the word of the prosecutor' during closing arguments." *Id.* (quoting *Kyles*, 514 U.S. at 444, 115 S.Ct. 1555).

The State will not be heard to contest the materiality of the undisclosed Barbara Trump interview when the undisclosed evidence would have impeached evidence heavily relied on by the State at trial. Trump was an important government witness. The State bolstered the reliability of Trump's eyewitness identification, and thus its ability to secure Ferguson's conviction despite Erickson's seriously undermined testimony, by emphasizing the event that triggered Trump's identification. " 'Having failed to disclose [the Barbara Trump interview], the state was able to claim much greater credibility from

31. The State asked Trump on pages 1020 through 1026 of the trial transcript: (i) "What did you receive in the mail while you were incarcerated, *from your spouse?;* " (ii) "And do you recall the time frame when *you received this mailing from your wife*?"; (iii) And when you opened *this envelope from your wife,* what was inside?"; (iv) Were you *aware that she was sending this* before you got it?"; (v) Prior to the time you saw these photographs *in the article that your wife sent you....* "; (vi) Do you recognize [exhibit 30] as the same Tribune article that you have described to the jury *that you received from your wife?* "; (vii) "[Are exhibits 17 and 18] ... the bottom two photographs that were in the article dated March 11, 2004 ... *that you received from your wife?* " (Emphasis added.)

32. Haws and Crane both testified in the habeas proceedings that although Trump told them about receiving a newspaper when they met with him in December 2004, Trump did not identify the newspaper in any detail other than to say that he received it in March or April, 2004 and that it displayed pictures of Ferguson and Erickson. Haws testified that Crane told him to go locate "the paper," and that he did so shortly after the meeting with Trump. Haws testified he went to the Tribune and found several papers from March and April 2004 covering the arrests of Erickson and Ferguson, and displaying their pictures. Haws testified that he and Crane reached the conclusion that the March 11, 2004 paper that was offered and received into evidence at Ferguson's trial was the newspaper Trump received from his wife. Haws and Crane both testified during the habeas proceedings that they never followed up with Trump to show him the newspaper in order to verify his story, and that instead, they elected to wait until trial to see if Trump could identify the newspaper they had concluded was the paper he received.

As we noted in an earlier footnote, Trump testified during the habeas proceedings that he did not receive a newspaper from his wife or from any source while he was in prison. Instead, he testified that Crane and Haws showed him a newspaper with Ferguson's and Erickson's pictures on the front during the December 21, 2004 meeting. Trump testified that he then told Crane and Haws he could identify the men as the two men he saw in the parking lot on the night of Mr. Heitholt's murder, even though he could not, and that he further told Crane and Haws that he received a copy of the same paper from his wife while he was in prison, even though he had not. Both Crane and Haws denied Trump's account of the December 21, 2004 meeting during their habeas testimony. We have not been required to resolve the conflict in this testimony to reach the conclusion that Ferguson is entitled to habeas relief.

[Trump's] testimony than the true facts would have warranted.' " *Engel,* 304 S.W.3d at 129 (quoting *Taylor v. State,* 262 S.W.3d 231, 245 (Mo. banc 2008)). Moreover, the State emphasized Trump's explanation for his identification even though the explanation was contested by other undisclosed evidence in the State's possession.[33] *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that State's use of testimony that results in a conviction without disclosing contrary evidence in its possession provides an independent basis for finding a *Brady* violation).

Trump's eyewitness identification effectively permitted the jury to cast aside any doubts they had about Erickson's seriously undermined credibility. "The testimony of a single witness is sufficient to establish the identity of a criminal defendant *if the jury believes it* beyond a reasonable doubt." *State v. Bolder,* 635 S.W.2d 673, 679 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983) (emphasis added). Yet, the jury was deprived of access to information which could have discredited Trump's explanation for his sudden, unexpected, and seemingly un-

influenced ability to identify Ferguson and Erickson.[34]

> Of course, all juries ... are given a credibility of the witnesses' instruction. But for [the] jury to assess the credibility of a witness, it must be aware of facts which might cause a witness to be less than fully truthful or untruthful. The determination of that credibility is solely within the province of the jury and it is entitled to any information [possessed by the State] which might bear on that credibility.

*Parker,* 198 S.W.3d at 188 (J. Ellis, dissenting) (quoting *State v. Brooks,* 513 S.W.2d 168, 173 (Mo.App. E.D.1973)). Under the peculiar facts and circumstances of this case, "any undisclosed evidence tending to discredit or impeach [Trump's eyewitness identification] ... would have had 'the potential to alter the jury's assessment of the credibility of a significant prosecution witness.' " *Id.* (quoting *U.S. v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998)).

The State acknowledged during oral argument that the ability to impeach Trump's testimony about the triggering source for his identification was potentially the "thread that starts to unravel the entire identification." We agree. The undis-

---

**33.** We understand that the State points out that Crane was unaware of the Barbara Trump interview. However, this is immaterial to analysis of a Brady violation. *Engel,* 304 S.W.3d at 127.

**34.** The State pointed out in its Brief that Judge Green found that Barbara Trump's undisclosed interview could not satisfy the *Brady* materiality standard because Trump's story about receiving the newspaper in prison, and unexpectedly realizing that he could identify Erickson and Ferguson, was "simply too fantastic to be believed." We are neither bound by nor reviewing Judge Green's finding. However, we cannot help but note the irony of the State's reliance on the finding. Either the State believed Trump's story and emphasized it to the State's advantage, indicating that the Barbara Trump interview was mate-

rial, impeaching evidence, or the State did not believe Trump's story and/or knew it had been impeached by Barbara Trump, and relied on the story anyway. Both scenarios have constitutional implications. Either the State committed a *Brady* violation by failing to disclose material evidence in its possession that was inconsistent with evidence it offered at trial, *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392, or the State used testimony it believed or had reason to believe was untruthful. *State v. Albanese,* 9 S.W.3d 39, 49 (Mo.App. W.D. 1999) ("As a general rule 'a conviction which results from the deliberate or conscious use by a prosecutor of perjured testimony violates due process and must be vacated.' ") (quoting *State v. Mims,* 674 S.W.2d 536, 538 (Mo. banc 1984)).

closed Barbara Trump interview was material because it "could have led the jury to a different assessment of [Trump's] credibility." *Engel*, 304 S.W.3d at 128. The nondisclosure of Barbara Trump's interview can " 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* (quoting *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555).

b. ***The direction the undisclosed evidence could have taken Ferguson***

The materiality of undisclosed evidence can be established not only by taking into account the effect the undisclosed evidence might have had at trial, but also by considering the "additional evidence to which a skillful counsel would [have been] led by careful investigation" had the undisclosed interview been disclosed. *Lee*, 573 S.W.2d at 134. The State admits this point, and in the process, all but admits the materiality of the suppressed Barbara Trump interview. When asked in oral argument to confirm that the only *Brady* element the State contested was materiality, the State responded "[p]otentially, yes ... [although] [Barbara Trump's interview] ***could have been used to track down additional information.*** We, of course, don't know if Mr. Trump would have revealed his deception at that time...." (Emphasis added.) The State acknowledged that due to the State's nondisclo-

sure, the answer to this question will never be known.

Barbara Trump's undisclosed interview would have naturally led Ferguson to investigate why Trump was claiming a sudden, triggered ability to identify Ferguson and Erickson. The possibility that such an investigation could have permitted Ferguson to effectively challenge Trump, resulting in recantation of Trump's reported identification prior to Ferguson's trial, cannot be discounted.[35] At a minimum, an investigation could have led Ferguson to discover that the State first contacted Trump while he was in prison. As we discuss, below, this information could have impacted the trial court's ruling on the admissibility of Trump's identification testimony, and would at a minimum have afforded Ferguson the ability to impeach Trump's identification as potentially suggested or coerced by the State.

The State's face-to-face meeting with Trump on December 21, 2004 was initiated by a telephone call from Haws to Trump in prison, approximately one week before Trump was to be released.[36] The call required orchestration, as arrangements were made for Trump to take the call in a private room at the prison. During the call, Haws told Trump that Crane wanted to meet with him as soon as possible after his release.[37]

---

35. We discuss, *infra*, that the potential success of any such investigation may have been otherwise hampered by the fact that Trump's reported identification of Ferguson and Erickson in December, 2004 and its trigger (the receipt of the newspaper) were never disclosed by the State, and were not discovered by Ferguson until Trump's deposition was taken in June, 2005, just a few months before Ferguson's trial.

36. Trump contended in his habeas testimony that both Haws and Crane participated in this telephone call. Haws testified that he was the only person on the call. Crane claimed that

he believed Haws contacted Trump while he was still in prison, but that Haws would be the better source of information on the subject. For our purposes, it is immaterial whether Crane participated in the call. The State does not contest that the call was made or its timing.

37. Haws and Trump agree on this point. Trump testified during the habeas proceedings that Haws also told him about the arrests of Ferguson and Erickson during the telephone call, and that Crane wanted to meet with him for the purpose of seeing if he could identify the men. Haws disputes this testimo-

Haws testified in the habeas proceeding that he did not make a written report of his contact with Trump in prison. As a result, neither the fact of the contact with Trump while he was in prison, nor its purpose, was disclosed to Ferguson.[38]

Prior to trial, Ferguson filed a motion in limine seeking to exclude Trump's identification testimony on the basis that the identification was not reliable and had been suggested by the State during the December 21, 2004 meeting with Trump. The State opposed Ferguson's motion in limine, and advised the trial court that the December 21, 2004 meeting with Trump was routine trial preparation, and not an investigatory interview. The State told the trial court that there had never been any intention of asking Trump during the trial preparation meeting whether he could identify Erickson and Ferguson. The State advised that it was surprised when Trump arrived to the December 21, 2004 meeting and spontaneously volunteered that he could identify Ferguson and Erickson. Only then, according to the State, was Trump asked to explain his realization, prompting Trump to volunteer the story about receiving the newspaper from his wife while he was in prison.

The State did not advise the trial court that Haws contacted Trump while he was in prison, and just days before his release. Instead, in opposing the motion in limine, the State inquired of Trump as follows:

Q: Sir, *after* you were released, you were contacted by my office-I believe you were contacted by Bill Haws.

A: Correct.

Q: And you were asked to come and visit with us.

A: Yes.

(Emphasis added.) The State's questioning of Trump, which suggested that Trump was first contacted by Haws *after* he was released from prison was inaccurate.

The difference in timing and circumstance of the State's initial contact with Trump was potentially impactful on the trial court's ruling on the motion in limine. Had Ferguson known that Trump was first contacted in prison, Ferguson could have argued that the State's pre-release contact of Trump was perceived by Trump as threatening or intimidating, influencing Trump's sudden ability to identify Erickson and Ferguson.[39] This information

---

ny. We need not resolve this contested evidence, as it has no bearing on our decision.

**38.** Depending on the content of the conversation, Haws may not have been required to make a report. Haws claims the contact with Trump was intended only to schedule a later meeting with Crane. Trump claims that Haws talked with him about whether he could identify two men who had been arrested in Mr. Heitholt's murder. As we discuss, *infra*, however, even if the nature of the contact with Trump in prison did not require the generation of a written report or a *Brady* disclosure at the time, that changed when the State later inaccurately advised the trial court that Trump was first contacted *after* he was released from prison.

**39.** Though we need not determine the credibility of Trump's testimony on the subject, we note that Trump testified in the habeas proceedings that he was threatened and intimidated by the contact he received while he was in prison. Though he testified that no one ever told him to lie, Trump testified that he felt he was being encouraged to do what he could to "help the State out," and that Crane and Haws were so confident that they had the right men in custody that he saw no harm in "helping the State out" with an eyewitness identification. Trump had been incarcerated in December 2001, about a month after Mr. Heitholt's murder, for a parole violation under circumstances he believed to be unfair. He was, according to his testimony, highly suspicious that his freedom upon his release from prison in December 2004 was fragile. It is not beyond the realm of possibility that Trump was motivated to fabricate his identification and its source out of a belief, whether or not grounded in fact, that if he did so, he

might have persuaded the trial court that sufficient government participation existed to require "the admissibility of the identification ... [to be determined] by balancing the likelihood of irreparable misidentification against the necessity for the government to use the identification procedures questioned." *State v. Lawrence*, 700 S.W.2d 111, 112 (Mo.App. E.D.1985) (citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) *overruled on unrelated grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). The State effectively blocked the trial court's application of the balancing test by persuading the trial court that the source of Trump's identification was not governmental. *Id.* ("[w]hen the source of the alleged taint is not governmental, the balancing test ... is not applicable.").

Even if awareness of Haws's prison contact with Trump would not have altered the trial court's ruling on the motion in limine, had Ferguson known of the contact, he could have used that information to impeach Trump's trial identification as potentially suggested or coerced by the State. Ferguson's ability to impeach Trump's identification as potentially coerced or suggested was " 'deprived of significant evidentiary force' by the prosecution's failure to disclose [the Barbara Trump interview] [as the] evidence support[ed] [Ferguson's] belief that investigators had encouraged [Trump] to testify" that he could identify Ferguson and Erickson. *Engel*, 304 S.W.3d at 128–29 (quoting *Taylor*, 262 S.W.3d at 245).

We conclude that the undisclosed Barbara Trump interview was material in light of the direction its disclosure could have taken Ferguson's investigation.

c. *The cumulative impression of materiality that is created when the undisclosed Barbara Trump interview is considered in conjunction with other information the State failed to disclose to Ferguson*

Though we are already persuaded that the undisclosed Barbara Trump interview was material, we are also directed to assess materiality by considering the cumulative effect of all undisclosed evidence. *Id.* at 126 (citing *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555 (holding materiality of undisclosed evidence is determined item by item, then cumulatively)). Our review of the record reveals a pattern of nondisclosures, each of which bears the trademark possessed by the Barbara Trump interview-a witness interview by Haws for which no written report was generated.

We have already discussed the first example. Haws acknowledged that he did not create a report about his contact with Trump while he was in prison.[40] We have already discussed how that undisclosed information potentially impacted the consideration given by the trial court to Ferguson's motion in limine, and Ferguson's ability to impeach Trump based on the prospect that his identification had been coerced or suggested by representatives of the State.

The habeas record reflects at least three other examples of material information possessed by the State that was never affirmatively or timely disclosed. In each case, Ferguson ended up discovering the information prior to or during trial through his own devices. But Ferguson did not independently discover the infor-

could avoid further trouble with the authorities.

**40.** See footnote number 38.

mation until long after the State was bound to disclose the information.

During trial, Ferguson sought to late endorse Melissa Griggs ("Griggs") as a witness who could testify that By George closed at 1:30 a.m. on the night of Mr. Heitholt's murder. This was important, as the State claimed that Ferguson and Erickson intended to rob someone so they could continue drinking, that they murdered Mr. Heitholt between 2:12 a.m. and 2:20 a.m., and that they then returned to By George and continued drinking. The State opposed the late endorsement of Griggs and denied Ferguson's claim that the State had known of, and failed to disclose, her anticipated testimony. Out of the presence of the jury, the trial court asked the State to bring its investigators into the court room and permitted Ferguson to call Griggs to the stand. As Griggs walked into the courtroom, Haws announced "I recognize her now, your Honor. I'm the one that talked to her." Crane asked "Did you do a report?" Haws responded "No." Griggs was then asked if she remembered Haws. Griggs indicated that she did and that she told Haws that By George had closed on the night of Mr. Heitholt's murder at 1:30 a.m.

In defending nondisclosure of the favorable Griggs interview, Crane argued "I never heard about [her] before. *No report was generated.*" (Emphasis added.) However, Crane's lack of personal knowledge about the Griggs interview did not relieve the State of the duty to affirmatively disclose the information. *Id.* at 127. Crane's statement underscores, however, that without a written report, Ferguson similarly had no knowledge before trial of the favorable interview with Griggs. Though Ferguson discovered this information during trial, the impact of his late discovery of the exculpatory testimony is difficult to discount.[41] The Griggs nondisclosure was not an isolated example.

After Erickson and Ferguson were arrested, Crane and Haws conducted at least two interviews of Ornt. Crane testified during the habeas proceedings that the meetings with Ornt were *before* the December 21, 2004 meeting with Trump. Haws testified in Ferguson's Rule 29.15 proceeding that he and Crane met with Ornt to determine "whether or not Mrs. Ornt could identify Ryan Ferguson and Chuck Erickson as the person she saw in the Tribune parking lot" from their pictures. Haws testified that Ornt "told us she couldn't make an identification" from the pictures of Ferguson and Erickson in the newspaper.[42] This statement by Ornt

---

41. During closing argument, the State argued that By George had been cited for violations on numerous occasions in an effort to discount Griggs's testimony that the bar closed at 1:30 a.m. The unstated implication was that By George had been cited for remaining open after legal closing hours. The habeas record indicates that Ferguson has since determined that citations issued to By George involved matters like the service of alcohol to minors, and not remaining open after hours. Because the Griggs interview was late discovered by Ferguson, Ferguson had no opportunity to anticipate, or to be prepared to negate, the State's implication that By George had been cited for remaining open after hours.

42. It is sound and logical that the State, having arrested Ferguson and Erickson, would follow up with Ornt to determine whether she could identify the men from their pictures in the newspaper, particularly as Ornt saw one of the two men in the parking lot "really good," and sufficiently to permit the creation of two separate composite sketches. The fact that the State admits that it approached Ornt to determine if she could make an identification from the pictures in the newspaper is in perplexing contrast to the State's testimony during the habeas proceedings that it never approached Trump for the same purpose, and that it had no intention of asking Trump whether he could identify Ferguson and Er-

was plainly favorable exculpatory evidence, as Ornt had seen one of the men on the night of Mr. Heitholt's murder so well that she assisted in the preparation of two composite sketches. Yet, Haws testified during the habeas proceedings as follows:

Q: And you didn't take any notes of [these] meetings?

A: No, I didn't.

Q: You didn't write any report?

A: No I didn't.

Without written reports, the State did not disclose the exculpatory evidence that Ornt could not identify either Erickson or Ferguson as the man she saw well on the night of Mr. Heitholt's murder from their pictures in the newspaper. Crane testified during Ferguson's Rule 29.15 proceedings as follows:

Q: After [Ornt] told you that, that she had seen those pictures [referring to the pictures of Ferguson and Erickson in the paper] and she couldn't tell you whether or not it was the people in the parking lot, did you disclose that to defense counsel when you found that out?

A: Well her deposition was taken and she said words to that effect.

Q: . . . between that time that she told you and the time you walked in and sat down for the [discovery deposition], you didn't disclose that information to defense counsel, whether it was two days, a week, a month, or however long it was?

A: Correct.

 Ferguson thus learned through his own devices about favorable information the State was duty bound to affirmatively disclose. It is true that if a defendant knows or learns of undisclosed information through some other means before or during trial, a conviction will not be overturned under *Brady*. *State v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008). However, the State had a duty independent of *Brady* pursuant to Missouri Supreme Court Rule 25.03(A)(9) to *timely* disclose any information in its possession or control that tended to negate Ferguson's guilt as to the offense charged. *State v. Myers*, 997 S.W.2d 26, 33 (Mo.App. S.D.1999).[43] "The basic purpose of the discovery process in a criminal proceeding is to allow the defendant a reasonable opportunity to prepare in advance of the trial and avoid surprise." *State v. Robinson*, 298 S.W.3d 119, 124 (Mo.App. E.D.2009). The State is potentially subject to sanction if it fails in the performance of this independent duty and if a "defendant shows that the failure to make a timely disclosure resulted in fundamental unfairness." *Myers*, 997 S.W.2d at 33.

Here, the State knew sometime before December 21, 2004 that Ornt could not identify either Ferguson or Erickson from their newspaper pictures as the man she saw well on the night of Mr. Heitholt's murder. Yet, the State never affirmatively disclosed this plainly exculpatory information to Ferguson. Ferguson learned of the information, but not until much later when he happened to depose Ornt just a

---

ickson during the December 21, 2004 meeting.

**43.** The United States Supreme Court observed in *Kyles* that *Brady* "requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate." 514 U.S. at 437, 115 S.Ct. 1555 (citing ABA Standards

for Criminal Justice, Prosecution Function and Defense Function 3–3.11(a) (3d ed. 1993) ("A prosecutor should not intentionally fail to make *timely disclosure to the defense, at the earliest feasible opportunity,* of the existence of all evidence or information which tends to negate the guilt of the accused[.]") (emphasis added)).

few months before his October 2005 trial.[44] Though Ornt was undoubtedly endorsed by the State as a witness, any suggestion "that endorsement of a witness can be a valid substitute for a proper and timely *Brady* disclosure is, quite simply, incorrect, as '[i]t is not enough for the prosecution to avoid active suppression of favorable evidence; *Brady* and its progeny *require disclosure.'*" *Parker,* 198 S.W.3d at 193 (J. Ellis, dissenting) (quoting *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir.2001) (emphasis in original)).

Perhaps the most compelling example of undisclosed information revealed in the habeas record involves Trump's revelations during the meeting with Crane and Haws on December 21, 2004. In that meeting, according to Crane and Haws, Trump spontaneously volunteered "surprising new information"[45] that he could identify Ferguson and Erickson as the men he saw in the parking lot on the night of Mr. Heitholt's murder. According to Crane and Haws, Trump then relayed his story that the identification was triggered by the receipt of a newspaper from his wife while he was in prison.

Haws testified in the habeas proceedings that he did not make a written report to record this "surprising new information." In fact, Haws testified that he was surprised to learn that he had not made a written report of the Trump interview given the importance of the information to the State's case.

The State never affirmatively disclosed to Ferguson that Trump had announced the sudden ability to identify Erickson and Ferguson as the two men he saw on the night of Mr. Heitholt's murder, or that his identification was triggered by the receipt of a newspaper from his wife. Just as with Ornt, Ferguson did not discover this plainly important evidence until he took Trump's deposition in late June 2005. Crane testified about the deposition during the habeas proceedings:

> I don't remember how much [Ferguson's trial counsel] got into depth with Mr. Trump ... but he did conduct an inquiry about how it was he could identify the individuals in the newspaper.

During the habeas proceeding, Crane explained that the "surprising new information" reported by Trump in December 2004 was not disclosed to Ferguson because it wasn't clear that Trump would be able to make an in-court identification of Ferguson. During oral argument, the State repeated this refrain. When asked if the State had no duty to disclose Trump's reported ability to identify Erickson and Ferguson because Crane "had some question in his mind whether in front of a jury [Trump] would hold firm to his ability to identify," the State responded:

> No, no, no, that's not what I am suggesting. I am suggesting that the prosecutor's restraint at that point arose not out of a desire to hide what he thought Mr. Trump was going to say but out of a fact that he didn't know what Mr. Trump was going to say and that their previous meeting had not been that definitive.

---

44. Neither the State nor Ferguson asked Ornt at trial whether she could make an *in-court* identification of Ferguson. In Ferguson's Rule 29.15 proceeding, Ornt claimed that she told the State during her pre-trial meetings with Crane and Haws not just that she couldn't identify Ferguson or Erickson from their photographs, but that she was confident that neither Ferguson nor Erickson was the man she saw well on the night of Mr. Heitholt's murder. The motion court found no credible evidence that Ornt made this precise statement to the State.

45. This was Haws's characterization, taken from Haws's habeas testimony.

The State's effort to rationalize its nondisclosure of Trump's December 21, 2004 revelations that he could identify Ferguson and Erickson from their pictures in a newspaper he received from his wife is facially absurd. Trump's ability to identify Erickson and Ferguson was plainly an important, new, material development, whether Trump's identification was a certainty or a possibility. Of course, Trump's revelations were not exculpatory evidence. Rather, they were inculpatory to Ferguson. However, Trump's December 21, 2004 revelations were inconsistent with his 2001 reports to police, rendering the revelations impeaching and within the scope of *Brady*. *Strickler*, 527 U.S. at 282 n. 21, 119 S.Ct. 1936 ("We reject [the] contention that [undisclosed witness interviews] do not fall under *Brady* because they were 'inculpatory.' ... Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness.").

We realize that Ferguson learned of Trump's revelations before trial, negating a *Brady* violation based on the State's nondisclosure. *Salter*, 250 S.W.3d at 714. However, it was plainly disadvantageous for Ferguson to first learn that Trump was able to identify Ferguson, and of the alleged "trigger" for the identification, during Trump's June 2005 deposition. The State's nondisclosure of this critical information—which it had possessed for six months—prevented Ferguson from undertaking any investigation into the purported identification or its triggering source prior to Trump's deposition. Ferguson had no meaningful ability, therefore to challenge Trump's revelations during his deposition. Yet, the State used Trump's "unchallenged" deposition testimony to argue, when opposing the motion in limine, that Ferguson had "concede[d], based on the deposition testimony of Mr. Trump, that [Trump] received this [referring to the March 11, 2004 newspaper] from his wife," [46] once again underscoring the State's reliance on Trump's story, and thus the materiality of the undisclosed Barbara Trump interview.

The reality is that until Trump's deposition in June 2005, the focus of Ferguson's defense strategy logically centered on discounting the *only* evidence Ferguson had been told connected him to Mr. Heitholt's murder—Erickson's confession. Ferguson's trial counsel consistently testified during Ferguson's Rule 29.15 proceedings as follows:

Q: Did you have a reason for not further investigating Jerry Trump.? [47]

A: We did not know about his purported identification from the pictures in the newspaper until we took his deposition, which would have been ... late June [2005].... That's when we first found out he was going to make an identification. The police reports had indicated

---

**46.** The State was referring to the fact that Trump testified in a discovery deposition taken by Ferguson in June 2005 about his ability to identify Erickson and Ferguson and the source of that identification. As we discuss, *infra*, though the State possessed this information as of December 21, 2004, Ferguson did not learn of the information until he took Trump's deposition nearly six months later.

**47.** The "further investigation" being referred to involved locating a co-worker of Trump's

who could have testified at trial that Trump told her shortly after Mr. Heitholt's murder that he would not be able to identify the two men he saw because he did not see their faces. At the time of the Rule 29.15 proceedings, Trump had not yet recanted his identification of Ferguson and Erickson or his story explaining the identification, and Ferguson was not yet aware of the undisclosed Barbara Trump interview.

he was not able to make an identification.

... I remember during the deposition when [Trump] gave us that information, or immediately after the deposition or at a break there, Mr. Crane said, "I was going to tell you that before you were done." ....

Q: So Mr. Crane didn't disclose that information to you? You got it directly from Jerry Trump during the deposition first?

A: Correct ... It sort of took us by surprise in the deposition.

It was undoubtedly a surprising turn of events for Ferguson to learn just a short time before trial that Trump, who by all *disclosed* accounts could *not* identify the men he saw on the night of Mr. Heitholt's murder, intended to identify Ferguson and Erickson as the men he saw based on the triggering event of receipt of a newspaper. The State's admitted failure to ever, let alone timely, disclose this critical evidence renders particularly repugnant the State's argument that Ferguson should have earlier discovered the undisclosed Barbara Trump interview in time to raise it on direct appeal or in his Rule 29.15 motion.

██ " 'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.' " *State v. Rodriguez*, 985 S.W.2d 863, 865 (Mo.App. W.D.1998) (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). The additional undisclosed but plainly material statements that were late discovered by Ferguson demonstrates that the undisclosed Barbara Trump interview and the undisclosed prison contact with Trump that her interview might have permitted Ferguson to discover, were not isolated incidents. We cannot overlook the cumulative impression these nondisclosures create.[48] We have already concluded that the undisclosed Barbara Trump interview was material, without regard to the additional nondisclosures. Any doubt on that point, however, would be resolved in favor of materiality in light of our cumulative consideration of all of the favorable evidence the State possessed, but failed to disclose. *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555. The pattern of nondisclosures " 'undermines confidence in the outcome of [Ferguson's] trial.' " *Id.* at 434, 115 S.Ct. 1555 (citation omitted).

### *(iii) Ferguson has Established Cause and Prejudice and a Brady Violation*

██ In light of our discussion, we conclude that Ferguson has established cause and prejudice permitting habeas review of his claim that the State committed a *Brady* violation when it failed to disclose Barbara Trump's interview. Ferguson has also established that his *Brady* claim is meritorious. The undisclosed Barbara Trump interview was material. *Brady* materiality "does not require demonstration by a preponderance that disclosure of the [Barbara Trump interview] would have resulted ultimately in [Ferguson's] acquittal." *Kyles*, 514 U.S. at 434, 115 S.Ct.

---

**48.** Ferguson did not assert before the trial court or in his Rule 29.15 motion that his late discovery of these nondisclosures collectively or independently violated his due process right to a fair trial. We have not considered the nondisclosures for that purpose, and express no opinion as to whether each or all of them would have risen to the level of a discovery violation warranting sanctions, or a material violation of Ferguson's constitutional right to a fair trial. Rather, as instructed by *Kyles*, we have considered the nondisclosures for the singular purpose of assessing *Brady* materiality with respect to the undisclosed Barbara Trump interview. Viewed through that narrow lens, the cumulative effect of Ferguson's late discovery of a substantial volume of information, nearly all of which revolved around the ability to identify Ferguson and Erickson, cannot be ignored.

1555. Materiality is established because the Barbara Trump interview can "'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. [ ] The question is not whether [Ferguson] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial ... resulting in a verdict worthy of confidence.'" *Engel,* 304 S.W.3d at 128 (quoting *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555) (emphasis added). Under the facts and circumstances of this case, we conclude that Ferguson did not receive a fair trial. His verdict is not worthy of confidence.

## V

### Consideration of Newly Discovered Evidence

We are aware that by vacating Ferguson's criminal conviction, we have erased any measure of comfort that Mr. Heitholt's family and friends may have drawn from the belief that a person responsible for his senseless and brutal murder has been brought to justice. As our Opinion indicates, however, Ferguson's conviction is not a verdict worthy of either judicial or public confidence.

In reaching the conclusion that Ferguson's conviction is not worthy of confidence, we have not been required to consider "newly discovered evidence" beyond the undisclosed evidence in the State's possession.[49] It is nonetheless appropriate to highlight that the lack of confidence in Ferguson's conviction caused by the State's material *Brady* violation is only enhanced by the existence of newly discovered evidence outlined in the habeas record. That evidence includes: (i) Trump's recantation of his eyewitness identifications of Erickson and Ferguson and of his story that the identifications were triggered by a newspaper he received from his wife (or from any other source) while he was in prison; (ii) Trump's allegation that he was first shown a newspaper with an account of Mr. Heitholt's murder by the State, and felt intimidated and pressured into identifying Erickson and Ferguson based on real or perceived threats that he would suffer repercussions following his release from prison if he did not; (iii) the related fact that Trump was contacted by the State one week before he was set to be released from prison; (iv) Erickson's re-

---

**49.** In *Griffin,* 347 S.W.3d at 77, our Supreme Court stated that "all available evidence uncovered following trial" should be considered "[w]hen reviewing a habeas petition premised on an alleged *Brady* violation." Because this statement was made in a paragraph of the opinion addressing *Brady* prejudice, the statement *could* be interpreted to suggest that our Supreme Court permits review of all available evidence, including newly discovered evidence not previously known to the State, in assessing *Brady* prejudice. We believe this construction might be an overly broad reading of *Griffin. Griffin* cites to *Engel,* 304 S.W.3d at 126, and to *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555. The reference in *Engel* to consideration of newly discovered evidence addressed: (i) the establishment of "cause" as a part of the cause and prejudice gateway where the newly discovered evidence is evidence in the State's possession but not disclosed; and (ii) a claim of innocence where all "newly discovered evidence," including evidence of innocence not previously known to the State, is naturally relevant to establish the manifest injustice gateway to habeas review or the freestanding claim of actual innocence. The reference to newly discovered evidence in *Kyles* was addressing *Brady* prejudice, but narrowly, as it was plainly referring to the cumulative effect of "newly discovered" undisclosed evidence that existed at the time of trial, and about which the State, but not the defendant, was aware. *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555. Thus, we do not read *Kyles* to broadly endorse consideration of all newly discovered evidence (beyond undisclosed evidence in the State's possession) in assessing *Brady* materiality. We caution therefore, against reading *Griffin* too broadly.

cantation of his "seriously undermined" trial testimony implicating himself and Ferguson in the murder of Mr. Heitholt; (v) Ornt's testimony that she is confident that neither Ferguson or Erickson are the man she saw well in the parking lot on the night of Mr. Heitholt's murder; (vi) Kim Bennett's testimony that she visited with Ferguson, then witnessed Ferguson and Erickson get into Ferguson's car and drive away from By George at 1:30 a.m. on the night of Mr. Heitholt's murder, consistent with Ferguson's trial testimony and inconsistent with the State's hypothesized theory of its case; and (vii) Boyd's testimony during the habeas proceedings which, when compared to statements Boyd gave to the police immediately after the murder or to investigators in the months before Ferguson's trial, reveals a curiously evolving and, in some instances, inconsistent recollection of events.

We need not determine the veracity of any of the newly discovered evidence to be mindful of its potential weight. *See, e.g., Amrine*, 102 S.W.3d at 550 (Wolff, concurring) (holding that "if there is a credibility determination to be made" about which time essential witnesses were lying, "it [should] be made by a jury"). Justice requires that whoever stands trial for Mr. Heitholt's murder should be " 'acquitted or convicted on the basis of all the evidence which exposes the truth.' " *United States v. Leon*, 468 U.S. 897, 900–01, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *Al-derman v. United States*, 394 U.S. 165, 175, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)).

## VI

### Conclusion

The State violated *Brady* by withholding the Barbara Trump interview. The undisclosed interview was material, resulting in a verdict that is not worthy of confidence. Accordingly, this court grants Ferguson's Petition for a writ of habeas corpus with respect to that portion of Claim Three addressing the undisclosed Barbara Trump interview. Claim One, Claim Two, the balance of Claim Three, and Claim Four in the habeas Petition are denied without prejudice to their refiling.

▆▆▆ As a result of our grant of habeas relief, Ferguson's convictions are vacated. If the State intends to retry Ferguson, it must file a written election to that effect in the Circuit Court of Boone County within fifteen days of the issuance of our mandate,[50] in which case Ferguson shall be immediately delivered by the Missouri Department of Corrections to the custody of the Boone County Circuit Court as a pretrial detainee, permitting the circuit court to set such conditions of bond as it deems appropriate.[51] If the State does not file a written election to retry Ferguson within fifteen days of the issuance of our mandate, then Ferguson shall be immediately

---

**50.** Our mandate will not issue until the exhaustion of all post-opinion motions permitted by Rule 83 and Rule 84.17. *See* Rule 84.24(n). During that timeframe, and in light of this Opinion, the State will no doubt be considering its intentions with respect to retrying Ferguson, rendering a fifteen day deadline following issuance of our mandate to file a written election to retry Ferguson reasonable, particularly in light of "the long delay since [Ferguson's] original trial during which time [Ferguson] has been imprisoned on convictions this court herein sets aside." *Engel*, 304 S.W.3d at 129–30.

**51.** A writ of habeas corpus dissolves and vacates a judgment of conviction, returning the habeas petitioner to the status of a pretrial detainee. *See Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Koster*, 388 S.W.3d at 605 n. 2.

and unconditionally discharged from the State's custody.

All concur.