

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| IN RE: WILLIAM L. BRANCH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | WD77788 |
| | ) | |
| | ) | OPINION FILED: |
| JAY CASSADY, IN HIS CAPACITY AS | ) | January 13, 2015 |
| SUPERINTENDENT, JEFFERSON CITY | ) | |
| CORRECTIONAL CENTER, | ) | |
| | ) | |
| Respondent. | ) | |

## ORIGINAL PROCEEDING IN HABEAS CORPUS

**Before Writ Division:** Mark D. Pfeiffer, Presiding Judge, and
Karen King Mitchell and Cynthia L. Martin, Judges

William L. Branch ("Branch") has petitioned this court for:

[A] Writ of Habeas Corpus vacating his conviction for the offense of first degree murder and his sentence of life without possibility of probation or parole (hereinafter "LWOP"), under Section 565.020, RSMo, because Section 565.020 RSMo is unconstitutional as applied to juvenile offenders. [Branch] moves that this Court remand his case for a remedy and proceedings consistent with *Miller v. Alabama/Jackson v. Hobbs*, 132 S.Ct. 2455 (2012).[1]

---

[1] Though this is the only basis upon which Branch's Petition has affirmatively sought relief, within the argument section of his briefing to this court, Branch suggests that his conviction and sentence for robbery in the first degree also be vacated or otherwise subject to resentencing; and Branch suggests that he should be permitted to withdraw his waiver of jury sentencing upon remand. These belated briefing assertions violate habeas corpus pleading requirements, *see State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 216-17 (Mo. banc 2001); are defectively

We conclude that the United States Supreme Court's ruling in *Miller v. Alabama/Jackson v. Hobbs*, 132 S.Ct. 2455 (2012) (hereinafter, "*Miller/Jackson*"), which held that a mandatory sentence of life without the possibility of parole ("LWOP") for juvenile homicide offenders is unconstitutional, applies retroactively to cases on collateral review, including the present case; accordingly, Branch is entitled to habeas relief. Thus, we remand this case to the Circuit Court of Cole County, Missouri, for resentencing in accordance with this opinion on Branch's conviction for the offense of first-degree murder. In all other respects, the judgment shall not be disturbed.

**Factual and Procedural History**

In February 2000, Branch pled guilty to murder in the first degree and robbery in the first degree in the Circuit Court of Cole County, Missouri ("circuit court"), for the murder and robbery of Michael A. Alfaro. Branch committed the offenses when he was seventeen years old. Pursuant to section 565.020, RSMo 1994, the circuit court sentenced Branch to a *mandatory* sentence of LWOP on the murder count; the circuit court sentenced Branch to a concurrent sentence of life imprisonment on the robbery count.

Branch filed a *pro se* Rule 24.035 motion for post-conviction relief on May 2, 2000, which he dismissed on July 28, 2000, before an amended motion was filed.

Branch filed his first petition for habeas corpus in the Circuit Court of Texas County, the county in which he was then incarcerated. That petition was denied by the court on July 24, 2014. Branch subsequently filed a petition for writ of habeas corpus in this court.

---

unaccompanied by corresponding precedent in support of such assertions, *Lueker v. Mo. W. State Univ.*, 241 S.W.3d 865, 868 (Mo. App. W.D. 2008); and ignore Missouri Supreme Court precedent on the issue of waiver of jury sentencing rights, *State ex rel. Taylor v. Steele*, 341 S.W.3d 634, 641-49 (Mo. banc 2011). As such, we refuse to consider these additional claims in the present habeas corpus proceeding.

## Standard of Review

We independently consider Branch's successive habeas petition as an original writ filed pursuant to the authority of Rule 91 and Rule 84.22, and subject to the procedure in Rule 84.24. *Ferguson v. Dormire*, 413 S.W.3d 40, 51 (Mo. App. W.D. 2013).

"[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *Id.* at 52 (internal quotation omitted). "Habeas proceedings are limited to determining the facial validity of a petitioner's confinement." *Id.* (internal quotation omitted).

"Habeas proceedings are not intended to correct procedural defaults as to post-conviction remedies." *Id.* (internal quotation omitted). "[H]abeas corpus is not a substitute for appeal or post-conviction proceedings." *Id.* (internal quotation omitted). If a defendant fails to raise a challenge to his conviction on direct appeal or in a timely post-conviction proceeding, the defendant is said to have procedurally defaulted on those claims and is barred from raising those claims in a petition for writ of habeas corpus unless:

(1) the claim relates to a jurisdictional issue;[2] or

(2) the petitioner establishes a showing by the preponderance of the evidence of actual innocence, [that] would meet the manifest injustice standard for habeas relief under Missouri law, (a "gateway of innocence claim"); or

(3) the petitioner establishes cause for failing to raise the claim in a timely manner and prejudice from the constitutional error asserted, (a "gateway cause and prejudice claim").[3]

---

[2] Though the term "jurisdiction" may only properly be used in the context of a court's subject matter or personal jurisdiction, *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 254 (Mo. banc 2009), it is settled that the imposition of a sentence in excess of that authorized by law may be raised by way of a writ of habeas corpus. *See State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 517 (Mo. banc 2010). As such, this exception to procedural default may be referred to as a "sentencing defect" claim instead of "jurisdictional defect" claim.

[3] We conclude that the avenue for habeas relief applicable to this case is the "jurisdiction" avenue, which, as already noted, has been applied by our courts to encompass sentencing defects. Thus, we need not and have not addressed the applicability of the manifest injustice/actual innocence and cause and prejudice avenues for habeas corpus relief in this case.

3

*Id.* at 52-53 (internal quotations omitted). Branch bears the burden of proving that he is entitled to habeas corpus relief. *Id.* at 53.

"[H]abeas review guards against unauthorized sentences," including a claim that a "sentence exceeds the sentence that is legally authorized."[4] *State ex rel. Taylor v. Steele*, 341 S.W.3d 634, 639 (Mo. banc 2011) (citing *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516-17 (Mo. banc 2010) (providing that a claim that the sentence exceeded what was permitted by law is a claim cognizable in a habeas proceeding even if the argument was raised, or should have been raised, in an earlier proceeding)). And, notably, in the context of our Missouri Supreme Court's retroactive application of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (ruling that Sixth Amendment entitles defendants in capital murder cases to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment), our Missouri Supreme Court stated:

> In sentencing Mr. Whitfield to death without a jury finding of factors 1, 2, and 3 against defendant, the court below imposed a sentence in excess of that permitted by law. "If a court imposes a sentence that is in excess of that authorized by law, habeas corpus is a proper remedy." *State ex rel. Osowski v. Purkett*, 908 S.W.2d 690, 691 (Mo. banc 1995), *citing*, *State ex rel. Dutton v. Sevier*, 336 Mo. 1236, 83 S.W.2d 581, 582-83 (1935). In such a case, *the rules regarding preservation of error by raising the error on direct appeal or in authorized post-conviction motions do not apply, for "those waivers do not affect his objection that the sentence exceeds the maximum allowed by law." Id.* Such an error is jurisdictional, and cannot be waived. *See e.g. Merriweather v. Grandison*, 904 S.W.2d 485, 489 (Mo. App. W.D. 1995).

---

[4] In *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003), Whitfield challenged his court-imposed death sentence as unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002), by filing a motion to recall mandate. "[A]lthough an appellate court divests itself of jurisdiction of a cause when the court transmits its mandate, jurisdiction may be reacquired by means of the judicial power to recall a mandate for certain purposes." *Id.* at 265 (internal quotation omitted). A mandate may be recalled in order to remedy the deprivation of a criminal defendant's federal constitutional rights. *Id.* The Missouri Supreme Court noted that even were a recall of mandate not available, Whitfield would be entitled to the same remedy in habeas corpus. *Id.* at 269 n.19. Because Branch did not appeal his conviction, no mandate abridging his constitutional rights has been issued by this court; therefore, habeas corpus, not a motion to recall mandate, is the procedural avenue available to Branch.

*State v. Whitfield*, 107 S.W.3d 253, 269 n.19 (Mo. banc 2003) (emphasis added).[5]

## Analysis

### *The Miller v. Alabama/Jackson v. Hobbs Decision*

The combined cases of *Miller v. Alabama* and *Jackson v. Hobbs* both involved fourteen-year-old defendants convicted of murder and sentenced to LWOP.  The sentencers had no sentencing discretion.   In *Miller/Jackson*, Miller came before the Supreme Court on direct review, while Jackson's case was before the Court on collateral review, after his petition for habeas corpus had been denied.

The Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" when the sentencer has not considered an "offender's youth and attendant characteristics."  *Miller/Jackson*, 132 S.Ct. at 2469, 2471.  Accordingly, "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  *Id.* at 2460.

While the Supreme Court's decision was rooted in the protections afforded by the Eighth Amendment to the United States Constitution, the *Miller/Jackson* court also built its decision around the Supreme Court's prior jurisprudence, reasoning that "the confluence of . . . two lines

---

[5] Herein lies our difficulty with the recent opinion from the Southern District of this court.  In *Brooks v. Bowersox*, No. SD33155, 2014 WL 5241645, at *3 (Mo. App. S.D. Oct. 15, 2014), the court concluded that identical claims of juvenile sentencing defect were procedurally barred, in part, because the juvenile habeas petitioners had failed to raise the constitutional claim on direct appeal or in an authorized post-conviction motion, and at the time of sentencing, there was nothing *patently* defective with sentencing the juvenile to mandatory LWOP.  The problem with this analysis is that, until a retroactive analysis is performed, the habeas court does not know whether the relevant juvenile sentencing was *patently* in excess of a sentence authorized by law.  Though the Southern District penalizes the habeas petitioners for raising the argument on collateral review, our Supreme Court did just the opposite in *Whitfield*, 107 S.W.3d 253.  In *Whitfield*, there was no question death was an available sentence; yet the manner in which the death penalty was imposed constituted an unauthorized sentence (when *Ring*, 536 U.S. 584, was applied retroactively).  Here, the same is true.  While LWOP was an available sentencing option, the complaint is that if *Miller/Jackson* is applied retroactively, the manner in which the LWOP sentence was imposed constitutes an unauthorized sentence.  Hence, we decline to follow the Southern District's holding in *Brooks v. Bowersox*.

of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." 132 S.Ct. at 2464.

In the first strand of cases (proportionate punishment), the Supreme Court has "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Id.* at 2463. This strand includes *Atkins v. Virginia*, 536 U.S. 304 (2002), holding that imposing the death penalty on mentally retarded defendants violates the Eighth Amendment; *Roper v. Simmons*, 543 U.S. 551 (2005), holding that the Eighth Amendment bars capital punishment for juvenile offenders; and *Graham v. Florida*, 130 S.Ct. 2011 (2010), holding that the Eighth Amendment prohibits a sentence of LWOP for a juvenile offender who commits a non-homicide crime. The Supreme Court reasoned that "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate." *Miller/Jackson*, 132 S.Ct. at 2465-66. "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these [mandatory sentencing schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id*. at 2466. The Court noted that in *Graham*, it likened LWOP sentences imposed on juveniles to the death penalty. *Id.*

In the second strand of cases (individualized sentencing), the Supreme Court has "prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Miller/Jackson*, 132 S.Ct. at 2463-64. This strand includes *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); and *Sumner v. Shuman*, 483 U.S. 66 (1987). This line of cases

6

requires that "capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." *Miller/Jackson*, 132 S.Ct. at 2467. One of these factors is the "mitigating qualities of youth." *Id.* (internal quotation omitted). "[Y]outh matters for purposes of meting out the law's most serious punishments." *Id.* at 2471. *Miller/Jackson* instructs the sentencer to take into account an offender's age, age-related factors, and other surrounding circumstances:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

132 S.Ct. at 2468 (citations omitted). *Miller/Jackson* does not categorically bar sentencing a juvenile offender who commits first-degree murder to LWOP.[6] "Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* at 2471. An LWOP sentence is constitutionally permissible *as long as the sentencer considers mitigating circumstances*. *Id.* at 2475. The converse must also be true, however; an LWOP sentence is *not* authorized by law unless the sentencer has first considered such mitigating circumstances.

---

[6] *Miller/Jackson* did not address the additional argument that LWOP should be categorically prohibited as a sentence for juveniles because it concluded it did not need to, particularly in light of its observation that "given all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." 132 S.Ct. at 2469.

When a new constitutional standard or rule is announced by the United States Supreme Court, the new rule applies to all criminal cases still pending on direct review.  *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).  "As to convictions that are already final, however, the rule applies only in limited circumstances."  *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). Because *Miller/Jackson* announced a new rule, and because Branch's conviction is final, we must determine whether the new rule in *Miller/Jackson* should apply retroactively.

In *Danforth v. Minnesota*, 552 U.S. 264 (2008), Justice Stevens discussed "retroactivity," noting that the word is misleading[8] because it speaks in temporal terms:

> "Retroactivity" suggests that when we declare that a new constitutional rule of criminal procedure is "nonretroactive," we are implying that the right at issue was not in existence prior to the date the "new rule" was announced.  But this is incorrect.  As we have already explained, the source of a "new rule" is the Constitution itself, not any **judicial** power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule.  What we are actually determining when we assess the "**retroactivity**" of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought.

*Id.* at 271.

---

[7] What happens when a court changes the law?

Retroactive application of new law . . . changes the law that was in effect at the time of the parties' actions.  Lower court decisions applying the old law to transactions occurring after the law-changing decision are rendered incorrect and must be reversed on appeal.  Final decisions dealing with transactions after the law-changing decision, likewise, are made incorrect; the law they applied is wrong—and is made wrong even in the past.

Kermit Roosevelt III, *A Little Theory is a Dangerous Thing:  The Myth of Adjudicative Retroactivity*, 31 Conn. L. Rev. 1075, 1111 (Spring 1999) (footnotes omitted).

[8] Justice Stevens noted that it makes more sense to speak in terms of the "redressability" of violations of new Supreme Court rules rather than the "retroactivity" of such rules, but the Court decided to continue using the term "retroactivity," despite its shortcomings.  *Danforth v. Minnesota*, 552 U.S. 264, 271 n.5 (2008).  The Supreme Court's "jurisprudence concerning the 'retroactivity' of 'new rules' of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the availability or nonavailability of remedies."  *Id.* at 290-91.

The standard for determining retroactivity can vary between federal jurisdictions and State jurisdictions. From 1967 until 1989, the Supreme Court required *federal* courts to determine whether a new constitutional standard should be given retroactive effect by applying the subjective factors delineated in *Linkletter v. Walker*, 381 U.S. 618 (1965), and *Stovall v. Denno*, 388 U.S. 293 (1967). The *Linkletter-Stovall* formula for determining retroactivity of a new constitutional standard requires the assessment of three factors: (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. *Stovall*, 388 U.S. at 297. The *Linkletter-Stovall* standard thus does not concern itself with determining whether a new constitutional standard is substantive or procedural.

In 1989, in *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion), the Supreme Court adopted a new test for determining when *federal* courts will apply new constitutional rules to cases subject to federal habeas review. Under *Teague*, a federal court may not apply a new constitutional rule retroactively **unless** the rule is a matter of substantive law, 489 U.S. at 311, or, if the rule is procedural, it "implicate[s] the fundamental fairness of the trial," (a so-called "watershed" procedural rule). *Id.* at 312. "*Teague* narrowed the situations in which a federal court will apply a new procedural rule retroactively to cases on collateral review, setting forth a generally applicable test rather than permitting federal courts to continue to make a case-by-case determination based on the *Linkletter-Stovall* factors." *State v. Whitfield*, 107 S.W.3d 253, 266 (Mo. banc 2003). In doing so, *Teague* shifted the focus to first determining whether a new constitutional standard is substantive versus procedural, with the effect that all substantive rules are afforded retroactive effect, and virtually no procedural rules are afforded retroactive effect. *Schriro*, 542 U.S. at 351-52.

9

However, it is plain that *Teague* limits **federal** courts' authority to apply retroactively newly announced constitutional standards or rules—it does not "limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions." *Danforth*, 552 U.S. at 280-81. Thus, States remain free to adopt their own standards for determining retroactivity so long as the standards are not narrower than *Teague* in their application. In *Whitfield*, the Missouri Supreme Court observed:

> It is up to each state to determine whether to apply the rule set out in *Teague*, to continue to apply the rule set out in *Linkletter-Stovall*, or to apply yet some other rule appropriate for determining retroactivity of a new constitutional rule to cases on collateral review. So long as the state's test is not narrower than that set forth in *Teague*, it will pass constitutional muster.

107 S.W.3d at 267. Consistent with its authority to do so, Missouri has elected to apply the *Linkletter-Stovall* standard to determine the retroactive application of new constitutional rules to cases pending on collateral review. *Id.* We are thus required to do the same in evaluating the retroactive effect of the new constitutional standard announced in *Miller/Jackson*.[9] In so doing, we must consider: "(1) the purpose to be served by the new rule, (2) the extent of reliance by

---

[9]As noted, *Linkletter-Stovall* does not concern itself with whether a new rule is substantive or procedural. However, because the Supreme Court directs that all substantive rules must be retroactively applied, and because States are free to use their own standards for determining retroactivity so long as the standards do not achieve a result that is narrower than *Teague*, it is axiomatic that *Linkletter-Stovall* is relevant only to new procedural rules. The Missouri Supreme Court has recognized this fact. *See, e.g.*, *State ex rel. Simmons v. Roper*, 112 S.W.3d 397 (Mo. banc 2003) (where declaration that imposition of the death penalty on juvenile offenders was categorically unconstitutional was retroactively applied because it was a substantive rule under *Teague*, and thus applied without discussion of *Linkletter-Stovall*); *Whitfield*, 107 S.W.3d at 267-68 (where Missouri Supreme Court accurately predicted that the new rule announced in *Ring*, 536 U.S. 584, was a procedural rule (*see Schriro v. Summerlin*, 542 U.S. 348, 353 (2004), holding rule announced in *Ring* to be procedural), and applied the *Linkletter-Stovall* standard to determine the rule should be retroactively applied).

Here, we are aware that (i) the Missouri Supreme Court has yet to determine whether it believes the new rule announced in *Miller/Jackson* is substantive or procedural; and (ii) the United States Supreme Court has yet to decide the same question. Both Courts have recently accepted cases that could permit resolution of the question. *See State ex rel. Collier v. Russell*, No. SC92980; *State ex rel. Lockhart v. Norman*, No. SC93335; *State ex rel. Griffin v. Norman*, No. SC93324; and *State ex rel. McElroy v. Cassady*, No. SC93465 (four habeas corpus cases filed in the Missouri Supreme Court as to which the Court recently activated a briefing and oral argument schedule); *Toca v. Louisiana*, No. 14-6381 (where Supreme Court granted writ of certiorari on December 12, 2014). Under these circumstances, we need not tackle whether the new rule announced in *Miller/Jackson* is substantive or procedural as we conclude that even if it is procedural, the *Linkletter-Stovall* standard would require its retroactive application.

law enforcement on the old rule, and (3) the effect on the administration of justice of retroactive application of the new standards." *Id.* at 268. The most important factor "is the purpose to be served by the new constitutional rule." *State v. Ussery*, 452 S.W.2d 146, 151 (Mo. 1970).

As to the first criteria, the purpose served by the rule set out in *Miller/Jackson* is to prohibit *mandatory* LWOP sentencing for juveniles and afford constitutional protection against sentences imposed without consideration of mitigation evidence. The rule protects juvenile homicide offenders from cruel and unusual punishment prohibited by the Eighth Amendment and guarantees them proportionate punishment. The Supreme Court and the Missouri Supreme Court have both held that a mandatory sentence of LWOP for juveniles is violative of the Eighth Amendment *only* because it is imposed without an opportunity for the sentencer to consider whether LWOP is just and appropriate in light of the juvenile's age, maturity, and other mitigating factors. *Miller/Jackson*, 132 S.Ct. 2455; *State v. Hart*, 404 S.W.3d 232, 239 (Mo. banc 2013); *State v. Nathan*, 404 S.W.3d 253, 270 (Mo. banc 2013). The Missouri Supreme Court has interpreted *Miller/Jackson* to require the State to persuade the sentencer "beyond a reasonable doubt that this [LWOP] sentence is just and appropriate under all the circumstances." *Hart*, 404 S.W.3d at 241. If the sentencer is persuaded of this proposition beyond a reasonable doubt, the trial court shall then impose the LWOP sentence; if the State fails to so persuade the sentencer, the juvenile offender cannot receive that sentence. *Id.* at 242. Thus, the juvenile homicide offender now has the opportunity to establish that LWOP is not an appropriate sentence. *Miller/Jackson* requires discretion in sentencing where no discretion previously existed and, as a practical matter, broadens the sentencing range for the juvenile homicide offender. *Miller/Jackson's* "newly established standard goes to the very integrity of the fact

11

finding process by which liberty is taken." *Ussery*, 452 S.W.2d at 151 (internal quotation omitted). Thus, the first factor favors retroactivity.

As to the second criteria, the extent of reliance by law enforcement on the old rule, there is no evidence that law enforcement relies on the mandatory imposition of sentence in performing its duties. Furthermore, "this consideration is outweighed by the factor just discussed." *Id.* Therefore, the second factor is neutral.

As to the third criteria, the effect on the administration of justice of retroactive application of *Miller/Jackson* "deserves serious consideration":

> A holding of retroactivity will most likely increase the burden on the courts,[10] prosecuting officials and law enforcement agencies by adding to the number of applications for relief filed by prisoners. Balancing, however, the public interest against the gravity of the right involved, we cannot sacrifice to mere expediency the wise restraints and constitutional safeguards which make men free and advance the quality of criminal justice. Our concern for efficiency must not outweigh our concern for individual rights.

*Id.* (citations omitted) (internal quotation omitted). Accordingly, the third factor favors retroactivity.

Our conclusion that *Miller/Jackson* must be retroactively applied employing the *Linkletter-Stovall* standard is consistent with our Supreme Court's decision in *Whitfield*. In *Whitfield*, the Missouri Supreme Court applied the *Linkletter-Stovall* approach to the issue of the retroactivity of *Ring*, 107 S.W.3d at 253. In so doing, the Missouri Supreme Court concluded that the *Ring* holding would be retroactive to collateral review cases. *Id.* at 268-69. In *Whitfield*, like here, the sentence in question (death penalty) was an available sentencing option to the sentencer. In *Whitfield*, like here, the defendant's sentence had long since become final, and the review in that case was collateral review. In *Whitfield*, like here, the United States Supreme

---

[10] The parties have only identified less than 100 cases in Missouri involving prisoners who are presently serving a mandatory sentence of LWOP for murders they committed before the age of eighteen.

Court had not eliminated the sentence in question (by its precedent in *Ring v. Arizona*), only changed the procedure that must be followed before such a sentence could be imposed. The *Whitfield* court concluded that the *Ring* rule must be applied retroactively. *Id.*

Although *Teague* does not control our assessment of retroactivity, it is nonetheless helpful to note that the majority of States which do employ the narrower *Teague* analysis have concluded that *Miller*/*Jackson* announces a substantive rule which must be applied retroactively. *See Johnson v. United States*, 720 F.3d 720, 720 (8th Cir. 2013) (per curiam) (finding that *Miller/Jackson* articulated "a new rule of constitutional law, made retroactive to cases on collateral review"); *People v. Davis*, 6 N.E.3d 709, 720 (Ill. 2014); *State v. Ragland*, 836 N.W.2d 107, 117 (Iowa 2013); *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270, 281 (Mass. 2013); *Jones v. State*, 122 So.3d 698, 703 (Miss. 2013); *State v. Mantich*, 842 N.W.2d 716, 731 (Neb. 2014). We recognize that there is a split of authority on this point, as other states that employ *Teague* have reached the contrary conclusion that *Miller/Jackson* announces a procedural rule that does not rise to the level of a watershed rule and that should not, therefore, be retroactively applied. *State v. Tate*, 130 So.3d 829 (La. 2013); *Commonwealth v. Cunningham*, 81 A.3d 1 (Pa. 2013); *Geter v. State*, 115 So.3d 375, 385 (Fla. Dist. Ct. App. 2012); *People v. Carp*, 828 N.W.2d 685, 715 (Mich. Ct. App. 2012). Although the *Teague* analysis does not control our determination, it is noteworthy that even employing that analysis, numerous jurisdictions reach the same conclusion we do today—that *Miller/Jackson* should be applied retroactively to cases that are subject to collateral review. One renowned constitutional scholar agrees:

> There is a strong argument that *Miller* should apply retroactively: It says that it is beyond the authority of the criminal law to impose a mandatory sentence of life without parole. It also would be terribly unfair to have individuals imprisoned for

life without any chance of parole based on the accident of the timing of the trial [or plea].

. . . .

[T]he *Miller* Court did more than change procedures; it held that the government cannot constitutionally impose a punishment. As a substantive change in the law which puts matters outside the scope of the government's power, the holding should apply retroactively.

Erwin Chemerinsky, *Chemerinsky: Juvenile Life-Without-Parole Case Means Courts Must Look at Mandatory Sentences*, A.B.A. J. Daily News (Aug. 8, 2012), http://www.abajournal.com/news/article/Chemerinsky_juvenile_life-without-parole_case_means_courts_must_look_at_sen/.

Therefore, we determine that the rule in *Miller/Jackson* must be applied retroactively in this case.

### Habeas Relief for Sentencing Defect

As stated previously, relief via a petition for habeas corpus is available where the petitioner can demonstrate that the court imposed a sentence in excess of that authorized by law. *Taylor*, 341 S.W.3d at 639. "A claim that the sentencing court has imposed a sentence in excess of that authorized by statute may be raised in a petition for writ of habeas corpus and is properly analyzed under the [jurisdictional defect] exception[.]" *State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo. App. W.D. 2010) (citing *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 515 (Mo. banc 2010)). "Even if a habeas petitioner has failed to timely raise a claim in a Rule 24.035 motion, it is settled that the imposition of a sentence beyond that permitted by the applicable statute or rule may be raised by way of a writ of habeas corpus." *Id.* (citing *Merriweather v. Grandison*, 904 S.W.2d 485, 486 (Mo. App. W.D. 1995)).

The essence of the Supreme Court's decision in *Miller/Jackson* is that while it is constitutionally permissible to sentence a juvenile homicide offender to LWOP, the *mandatory* imposition of an LWOP sentence is unconstitutional because it is prohibited by the Eighth Amendment's ban on cruel and unusual punishment. Thus, when the trial court imposed a *mandatory* sentence of LWOP to Branch, the trial court's sentence is one of substantive unconstitutionality, not a mere procedural error having constitutional implications. In sentencing Branch to mandatory LWOP when the sentencer was not given an opportunity to consider mitigating evidence, the trial court imposed a sentence in excess of that permitted by law. *See Whitfield*, 107 S.W.3d at 269 n.19.

The State argues that Branch's sentence is not patently defective because LWOP is still an available sentencing option for juvenile homicide offenders. The State's argument ignores the meaning of retroactivity: that the *Miller/Jackson* change in the law is deemed to have been in effect at the time of Branch's sentencing. And, when the *Miller/Jackson* precedent is deemed to be the law in effect at the time of Branch's sentencing, *mandatory* sentencing of LWOP without conducting a "mitigating factors" analysis was not a sentence that was lawfully available to the sentencer.[11] In other words, a sentence of LWOP is no longer a possible sentencing option, *unless and until* a "mitigating factors" hearing has taken place. And, as a matter of precedent, once the *Miller/Jackson* rule is applied retroactively to collateral review, the holdings of *State v. Nathan*, 404 S.W.3d 253, 270 (Mo. banc 2013), and *State v. Hart*, 404 S.W.3d 232, 239 (Mo.

---

[11] The State relies upon *Thomas v. Dormire*, 923 S.W.2d 533 (Mo. App. W.D. 1996), where this court concluded that before and after the legislatively enacted sentencing enhancement statutes in question took effect, there was nothing on the face of the record suggesting that the defendant had been sentenced in excess of law. *Id.* at 534-35. Here, however, there is. When *Miller/Jackson* is applied retroactively, the face of the record shows that no "mitigating factors" hearing was conducted, though required. Further, the face of the record demonstrates that the circuit court did not consider "mitigating factors" and, instead, imposed a *mandatory* LWOP sentence. Without the "mitigating factors" hearing, the face of the record *patently* demonstrates that imposing LWOP without considering Branch's youth and attendant circumstances was not a sentencing option available to the circuit court. Thus, the State's reliance upon *Thomas v. Dormire* is misplaced.

banc 2013), cannot be ignored.  Remand for resentencing is required.  This case is no different than *Whitfield* and relief must be granted.

## Conclusion

Because the circuit court's imposition of a mandatory LWOP sentence was in excess of that authorized by law, Branch is entitled to habeas relief and to be resentenced by the circuit court as to the murder in the first degree count on remand using the procedure described in *Miller/Jackson* as interpreted in *Hart.*  In all other respects, the judgment of the circuit court shall remain undisturbed.

_____
Mark D. Pfeiffer, Presiding Judge

Karen King Mitchell, Judge, concurs.
Cynthia L. Martin, Judge, concurs in a separate opinion.



# In the
# Missouri Court of Appeals
# Western District

IN RE:  WILLIAM L. BRANCH,  )
                           )
                Petitioner, )   WD77788
                           )
v.                          )   OPINION FILED:  January 13, 2015
                           )
JAY CASSADY, IN HIS CAPACITY )
AS SUPERINTENDENT,          )
JEFFERSON CITY CORRECTIONAL )
CENTER,                     )
                           )
                Respondent. )

## CONCURRING OPINION

I concur in the majority opinion.  I write separately because our Supreme Court in *State ex rel. Taylor v. Steele*, 341 S.W.3d 634 (Mo. banc 2011) painstakingly explained the limited reach of *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003), which determined that the holding in *Ring v. Arizona*, 536 U.S. 584 (2002) should be retroactively applied employing the *Linkletter-Stovall*[1] standard.  In so doing, *Taylor* pointed out that the United States Supreme Court in *Schriro v. Summerlin*, 542 U.S. 348 (2004) reached the contrary conclusion that the holding in *Ring* was procedural and

---

[1]*Linkletter v. Walker*, 381 U.S. 618 (1965); *Stovall v. Denno*, 388 U.S. 293 (1967).

should not be retroactively applied. Though the analysis in *Schriro* was undertaken pursuant to *Teague v. Lane*, 489 U.S. 288 (1989), and not pursuant to the more liberal test for assessing the retroactivity of procedural rules described in *Linkletter-Stovall, Taylor* hints at the *possibility* of a shift in our state's retroactivity jurisprudence.

In light of that possibility, or perhaps better stated, regardless of that possibility, I believe it appropriate to explain in this important case that I would reach the same result as the majority whether the *Teague* or the *Linkletter-Stovall* standard is applied. That is because analysis in *Schriro* strongly suggests that the United States Supreme Court will construe the new rule announced in *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455 (2012) to be a substantive rule which must be retroactively applied under either standard.[2]

The retroactivity analysis employed in federal courts, commonly referred to as the *Teague* analysis, was most recently summarized in *Schriro*:

> When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances. New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish . . . . Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him.
>
> New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that

---

[2]The majority opinion correctly notes that although States are free to employ a retroactivity analysis other than *Teague*, any such analysis cannot be applied to reach a result that is narrower than *Teague*. *Whitfield*, 107 S.W.3d at 267. Under *Teague*, any substantive rule must be retroactively applied to cases that are final. Thus, if the new rule announced in *Mille*r is substantive, it must be retroactively applied regardless the applicable retroactivity standard.

someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."

542 U.S. at 351-52 (citations omitted) (emphasis in original). Thus, the *Teague* analysis requires two steps. First, it must be determined if a "new rule" is substantive or procedural. Second, and only if the rule is determined to be procedural, it must be determined whether the new procedural rule is a watershed rule.[3]

Plainly, *Miller* announced a new rule. It announced that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishment.'" *Id*. at 2460. The first step in the *Teague* analysis, therefore, is to determine whether that rule is substantive or procedural. Stated differently, is the new rule announced in *Miller* a "constitutional determination[] that place[s] particular . . . persons [those under the age of 18] covered by a statute [that imposes a mandatory life without parole sentence] beyond the State's power to punish" that should "apply retroactively because" there is a "significant risk" that such persons "face[] a punishment that the law cannot impose upon [them]"? *Schriro*, 542 U.S. at 352.

The new rule announced in *Miller* does not fit neatly into either a substantive or procedural box. On the one hand, the new rule declares an authorized sentence unconstitutional--*mandatory* life imprisonment without parole for persons under the age

---

[3]The Court in *Shriro* made this point clear when it noted that in referring to new *substantive* rules, it has "sometimes referred to [such rules] as falling under an exception to *Teague's* bar on retroactive application of procedural rules; . . . they are more accurately characterized as substantive rules not subject to the bar." *Schriro*, 542 U.S. at 352, n.4.

3

of 18--suggesting the rule is substantive, as it is beyond the State's authority to impose a sentence required by statute on a particular class of persons. On the other hand, the new rule does not *categorically* prohibit the imposition of life imprisonment without parole on a person under the age of 18, so long as the sentencing authority first considers the offender's "chronological age and its hallmark features." *Miller*, 132 S.Ct. at 2468. This could suggest that the new rule is procedural to the extent it is viewed to "regulate only the *manner of determining*" sentencing. *Schriro*, 542 U.S. at 353.

I believe the answer to this question is found in the analysis in *Schriro*. *Schriro* held that "[a] decision [of the United States Supreme Court] that modifies the elements of an offense is normally substantive rather than procedural." *Id*. at 354. *Schriro* reminded that in *Ring*, the Court observed that "'Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' . . . requir[ing] that they be found by a jury.'" *Schriro*, 542 U.S. at 354 (quoting *Ring*, 536 U.S. at 602).

Yet, *Schriro* did not find the "new rule" announced in *Ring* to be substantive. The Court's explanation is instructive, and in my view is controlling of our decision in this case. *Ring*, of course, held that "because Arizona law authorized the death penalty only if an aggravating factor was present, *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] required the existence of such a factor to be proved to a jury rather than to a judge." *Schriro*, 542 U.S. at 351 (citing *Ring*, 536 U.S. at 603-609). *Schriro* thus held that "[j]udged by th[e] standard [that a rule regulate[s] only the *manner of determining* the defendant's culpability] *Ring'*s holding is properly classified as procedural." *Id*. at 353. The Court explained that *Ring* "did not alter the range of conduct Arizona law subjected

4

to the death penalty. . . . Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment." *Id*. In other words, *Ring* announced a new rule that regulated the "manner of determining" the death penalty, as in **who** must make certain findings or **how** those findings must be made-- quintessentially *procedural* concerns. *Ring* did **not** regulate **what** must be found to impose the death penalty--a quintessentially *substantive* concern. Emphasizing this point, *Schiro* characterized *Ring* as a holding that merely allocated decisionmaking, noting that "[r]ules that allocate decisionmaking authority in this fashion [like *Ring*] are prototypical procedural rules." *Id*.

The new rule announced in *Miller* does not regulate **who** must make findings, or **how** findings must be made, before a sentence of life without possibility of parole can be imposed on a person under the age of 18. *Miller* regulates **what** must be considered before a sentence of life without possibility of parole can be imposed on a person under the age of 18. Specifically, *Miller* holds:

> To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed it ignores that he might have been charged and convicted of a lessor offense if not for incompetencies associated with youth--for example his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own

5

attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when circumstances suggest it.

132 S.Ct. at 2468 (citations omitted). After outlining the host of mitigating circumstances a mandatory life without possibility of parole sentence forbids a sentencing authority to consider, *Miller* went on to announce its holding:

> [A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crime, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment ban on cruel and unusual punishment.

*Id*. at 2475.

Plainly, *Miller* announced **what** must be considered before a life sentence without possibility of parole can be imposed on a juvenile, and not **who** must make that decision or **how** that decision must be made. And though it did not categorically ban the imposition of a sentence of life without possibility of parole on a juvenile, it came very close, holding that "given all we have said in *Roper* [*v. Simmons*, 543 U.S. 551 (2005)], *Graham* [*v. Florida*, 560 U.S. 48 (2010)], and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. at 2469.

I thus believe that the new rule announced in *Miller* is a substantive rule that must be retroactively applied. Additional discussion in *Schriro* supports this conclusion. Having concluded that *Ring* announced a new procedural rule because it directed the manner (i.e. the **who** or **how**) of determining culpability, *Schriro* explained why this was

6

the case, notwithstanding that Arizona's death penalty statute required consideration of aggravating factors that were substantive in nature because they were "'the functional equivalent of element[s].'" 542 U.S. at 354, (quoting *Ring*, 536 U.S. at 609):

> A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes . . . . But that is not what *Ring* did; the range of conduct punished by death in Arizona was the same before *Ring* as after. *Ring* held that, *because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively were* elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements.

542 U.S. at 354 (citations omitted). In other words, *Schriro* explained that *Ring* did not announce new "elements" that must be considered before imposing the death penalty--it only held that factors specified by a State statute that must be found before imposing a particular sentence are "effectively elements," and thus must be determined by a jury. *Id*. Importantly, *Schriro* went on to hold:

> This Court's holding that, *because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; **the latter would be substantive**.

*Id*. (italicized text in original, bold and italicized emphasis added). In other words, had *Ring* (as opposed to the Arizona State statute) announced the aggravating factors which must be considered before the death penalty could be imposed, that "new rule" would have been a substantive rule.

Overlaying the new rule announced in *Miller* to the rubric explained in *Schiro* supports the conclusion that *Miller* announced a substantive rule. *Miller* identified numerous "factors" not present in the State statutes it was considering that *must* be

7

considered before life imprisonment without possibility of parole can be imposed as a sentence on a juvenile. Stated another way, unless the evaluation of those factors militate toward the imposition of life without possibility of parole, (an outcome *Miller* predicted would be "uncommon," 132 S.Ct. at 2469), that sentence cannot be imposed on a juvenile. The *Miller* "factors" are thus essential precursors to the imposition of an aggravated sentence of life without possibility of parole, rendering them seemingly indistinguishable from "aggravating factors" set forth in a State statute that must be found before the death penalty can be imposed. Thus, the "factors" identified in *Miller* are, at a minimum, *substantive* matters that must be *considered* by the sentencing authority before a heightened sentence can be imposed, and may well be "effectively elements" that must be *found* to exist.[4] Because the "factors" identified in *Miller* constitute a condition on the imposition of a particular sentence on a particular class of persons that has been created by the United States Supreme Court, the "factors" constitute a new substantive rule. *Schriro*, 542 U.S. at 354 (holding that United States Supreme Court's declaration that a certain fact is essential to the imposition of a particular sentence "would be substantive"). Though there is no question that *Miller* characterizes its holding as "mandat[ing] only that a sentencer follow a certain process--considering an offender's youth and attendant characteristics--before imposing a particular penalty," 132 S.Ct. at 2471, the use of the

---

[4]The Missouri Supreme Court has already weighed in on this point in the context of juvenile cases on direct review (and thus not final) when *Miller* was decided. In *State v. Hart*, 404 S.W.3d 232, 241 (Mo. banc 2013), the Court held that "[u]ntil further guidance is received, a juvenile offender cannot be sentenced to life without parole for first-degree murder unless the state persuades the sentencer beyond a reasonable doubt that this sentence is just and appropriate under all the circumstances." Hart also held that unless jury sentencing is effectively waived by a juvenile offender, "the jury must be instructed properly that it may not 'assess and declare' [the juvenile's] punishment for first-degree murder should be life without parole unless it is persuaded beyond a reasonable doubt that this sentence is just and appropriate under all the circumstances." *Id*.

8

word "process" cannot erase the reality that the "process" announced in *Miller* is not merely a ***who*** or ***how*** decisionmaking directive, but is instead a clear announcement of ***what*** must be substantively considered as an express condition to the imposition of a heightened sentence. When the United States Supreme Court directs ***what*** must be found before a particular sentence can be imposed, it is directing a matter of substance, not procedure. *Schriro*, 542 U.S. at 354.

For these reasons, I conclude that under either the *Linkletter-Stovall* standard or the *Teague* standard, *Miller* announced a new substantive rule that must be retroactively applied.

_____
Cynthia L. Martin, Judge